295 F.2d 583
 MOORE-McCORMACK LINES, INC., Petitioner-Appellant-Appellee,
v.
Jean O. RICHARDSON, Individually and as Executrix of the Estate of Harold R. Richardson, et al., Claimants-Appellees-Appellants.
 No. 157.
 Docket 26485.
 United States Court of Appeals Second Circuit.
 Argued February 10, 1961.
 Decided October 25, 1961.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Eugene Underwood, New York City (John J. Crowley, Robert A. Feltner, James W. Lynch, William M. Kimball, Burlingham, Hupper & Kennedy, Francis I. Fallon, New York City, on the brief), for petitioner.
 Benjamin H. Siff, John J. Martin, Louis R. Harolds, New York City (Bernard Rolnick, New York City, for claimants Rosario, De Jesus, Hernandez, Henry, Sullivan, Del Valle, Williams; Joseph Friedberg, New York City, for claimant Cadiz; Bigham, Englar, Jones & Houston, and Arthur R. Hohmann, New York City, for claimants Richardson and Wall; Standard, Weisberg, Harolds & Malament, and Lee Pressman, New York City, for claimant Berk; Robert Kilroe and Henry N. Longley, New York City, on the brief), for claimants-appellees-appellants.
 Before LUMBARD, Chief Judge, MADDEN, Judge, United States Court of Claims,* and WATERMAN, Circuit Judge.
 LUMBARD, Chief Judge.
 
 
 1
 Moore-McCormack Lines, Inc., appeals from a final decree of the United States District Court for the Southern District of New York in an admiralty proceeding awarding damages against Moore-McCormack to eleven claimants for losses resulting from the capsizing of the steamer "Mormackite" off Cape Hatteras on the morning of October 7, 1954, with the loss of 37 lives and a cargo of iron ore and cocoa beans. The death claimants cross-appeal, challenging the district court's disallowance of interest from the date of death on the four death claims and the set-off against certain of the awards of the receipts from insurance policies on which Moore-McCormack had paid all the premiums.
 
 
 2
 In 1954 Moore-McCormack brought a limitation proceeding. 46 U.S.C.A. § 183 et seq. After trial on the issues of liability and limitation, the district court found Moore-McCormack liable without limitation to all claimants, death, personal injury and cargo alike. Petition of Moore-McCormack Lines, Inc., D.C.S.D. N.Y.1958, 164 F.Supp. 198. We affirmed as to the personal injury and death claimants, but upheld Moore-McCormack's right to limitation against the cargo claimants. Moore-McCormack Lines, Inc. v. Armco Steel Corporation, 2 Cir., 1959, 272 F.2d 873, certiorari denied 1960, 362 U.S. 990, 80 S.Ct. 1079, 4 L.Ed. 2d 1023. The district court then proceeded to determine the amount to which each personal injury or death claimant was entitled. Petition of Moore-McCormack Lines, Inc., D.C.1960, 184 F.Supp. 585. From the resulting awards on four of the death and seven of the personal injury claims Moore-McCormack now appeals.[1]
 
 
 3
 Moore-McCormack, while not challenging the power of the trial court to award upon sufficient proof compensation for all items of damage making up the awards, objects to many of the awards as being excessive. It also contends that the district judge insufficiently detailed certain of the findings of fact and on occasion erred in his computation. That we have both the power and the duty to examine awards for excessiveness, even when the awards are made by a jury, seems well established. See Dagnello v. Long Island R. R. Co., 2 Cir., 1961, 289 F. 2d 797. We do so here where the awards were made by a judge in admiralty.
 
 
 4
 The district court allowed damages for the pain and suffering endured by the members of the crew after the "Mormackite" capsized on October 7, 1954 at 9:45 A.M. at the rate of $300 per hour for each hour before death or rescue. The length of suffering varied from ten hours in the case of Carmen Cadiz, who the court found died at approximately 7:30 P.M. on the day of the sinking, to an award for fifty hours to Charles Henry, the last survivor to be picked up from the water. Thus these awards ranged from $3,000 to $15,000.
 
 
 5
 We think $300 per hour for pain and suffering while in the water is excessive. That the crew's experience before the death of most of them and the rescue of the remaining few was harrowing and bitter in the extreme is clear from Judge McGohey's summary at 184 F.Supp. 585, 589-590. We agree with the trial judge that there is no way of differentiating between the suffering of any deceased or survivor and that the award should be assessed on the same basis as to all. Concededly, there is also no way by which suffering can either be measured or compensated for in money. But courts are nonetheless required to do precisely that, and they have attempted to resolve this insolvable problem in scores of cases.[2] As the awards in each case turn on so many varied facts, no purpose would be served in citing precedents. However, from such guidance as the numerous decisions dealing with the problem afford, we conclude that the award of $300 an hour is excessive and that it should be reduced to $150 per hour. Since this is the only issue before us in the Sullivan, Henry, Hernandez and Williams claims, these awards are modified accordingly, and as so modified are affirmed, with interest from the date of the district court decree, June 3, 1960. We proceed to consider the other issues raised with respect to the seven other claims.
 
 Claims from the Death of Harold Richardson
 
 6
 Richardson, the chief mate, was a competent officer and had made a distinguished record with the Moore-McCormack Lines. The district court found that he survived for twenty-four and one-half hours in the water before he died and allowed $7,350 for pain and suffering.
 
 
 7
 The district court allowed to the widow for herself and Richardson's two minor children damages totaling $184,361. Moore-McCormack claims error in the manner in which the court computed the present value of the future pecuniary loss to be $118,296, contending that this item should be reduced to $113,592. The trial court found the estimated loss for each year discounted by 4% and totaled the resulting figures. Moore-McCormack urges that an average annual loss for the decedent's entire remaining working life expectancy be calculated and the present cost of an annuity paying that sum be awarded. As the district court found that Richardson's beneficiaries would have received more for the years 1962 through 1971 than for the years 1972 through 1987, the method of the district court seems to us more fair and exact than that proposed by Moore-McCormack.[3]
 
 
 8
 Moore-McCormack further complains that the awards to the Richardson children for loss of nurture were excessive. The district judge found that the fair value of the lost care, guidance and training to each of the two daughters during minority was $1,000 per year.
 
 
 9
 There was evidence to support an award for loss of a father's care, guidance and training. See Norfolk & Western Ry. v. Holbrook, 1915, 235 U.S. 625, 35 S.Ct. 143, 59 L.Ed. 392; Sipes v. Michigan Cent. R. R. Co., 1925, 231 Mich. 404, 204 N.W. 84. As the two daughters were aged 7 and 4 respectively in October of 1954, it was necessarily difficult for the claimant to supply much evidence concerning the father's contribution to the training of his daughters. It was testified that Richardson was an attentive father, concerned with the welfare of his children and that he spent as much time as he could with them during his periods of shore leave. From his prior record and character there was good reason to believe that he would have made a real contribution to their nurture, guidance and training, particularly in future years. An award for the loss is therefore justified. See 2 Harper & James, The Law of Torts, § 25.14 (1956), McCormick, Damages, § 99 (1935). Although the compensation is generous, substantially more was awarded for loss of nurture in both Meehan v. Central R. R. Co. of New Jersey, D.C.S.D.N.Y.1960, 181 F.Supp. 594, 621-622 ($1,200 per year to each child) and Rogow v. United States, D.C. S.D.N.Y.1959, 173 F.Supp. 547, 561-562 ($1,420 per year to each child). In Meehan and Rogow there may well have been evidence of greater loss, particularly since here the deceased were seamen necessarily absent from home much of the time, but all such distinctions are adequately reflected in the comparative modesty of the awards presently reviewed.
 
 
 10
 We therefore modify the Richardson award by reducing the amount allowed for pain and suffering from $7,350 to $3,675. The district court properly offset against the award sums paid to Richardson's widow under a liability insurance policy (derived from the Second Seamen's War Risk Policy) taken out by petitioner and on which all premiums had been paid by petitioner. See Lawson v. United States, 2 Cir., 1951, 192 F.2d 479; O'Connor v. United States, 2 Cir., 1959, 269 F.2d 578; 2 Harper & James, Law of Torts, § 25.22 (1956). The award as modified therefore totals $175,186.
 
 Claims From the Death of Edward T. Wall
 
 11
 Edward T. Wall had been the vessel's chief engineer. The court found that he died after twenty-seven hours in the water. Thirty-four years of age at the time of his death, he left a widow, and three children, aged 16, 10 and 3. The district judge allowed damages to each of the three children at the rate of $1,000 per year for loss of care, guidance and training until they became 21 years of age.
 
 
 12
 For the reasons previously given we reduce the damages allowed for pain and suffering from $8,100 to $4,050. We affirm the awards for loss of nurture. The total awarded on this claim is therefore reduced from $190,159 to $186,109.
 
 Claims From the Death of Lawrence Berk
 
 13
 Lawrence Berk, third assistant engineer on the "Mormackite," was twenty-five years old at the time of his death. He was unmarried and lived with his parents and younger brother, Norman, whose ages were respectively 54, 46 and 14 years. The district judge found that Berk had died after ten and one-half hours in the water.
 
 
 14
 For loss to Berk's parents of future benefits,[4] the lump sum of $20,000 was allowed. As Moore-McCormack points out, this is sufficient to provide an annuity of $1,000 per year to the parents for the normal life expectancy of their deceased son, despite the fact that they would normally have predeceased him by a considerable period of time. Moreover, the evidence shows that neither of Berk's parents were dependent upon him for their normal living expenses nor is it likely that they would thereafter have been forced to look to him for the major portion of their living expenses. In any event, in view of the trial judge's finding that Berk would have married by the time he reached the age of thirty in 1959, it is highly improbable that Berk would have been able to give or would have given to his parents so substantial a sum as was here awarded. We agree with the district judge that Berk's unusual generosity in contributing $7,200 to the cost of his parents' house is not a reliable indication of the extent of his future generosity, particularly since this house, at the time of its purchase, was Berk's home as well. Under these circumstances Berk might reasonably be expected to give, at the very most, $500 per year during the twenty-five years of life expectancy of the younger parent at the time of the decree. The present value of an annuity of $500 per year for twenty-five years discounted at 4% is $7,811. Recognizing that Berk might from time to time make special gifts to his parents, we think a proper allowance was $10,000 and accordingly we reduce this portion of the award from $20,000 to $10,000.
 
 
 15
 For the reasons already stated the award for pain and suffering must be reduced from $3,100 to $1,550. Properly offset against the award were sums paid under a seamen's insurance policy, see Richardson claim, supra. The total award is therefore reduced from $23,850 to $12,300.
 
 Claims From the Death of Carmen Cadiz
 
 16
 Carmen Cadiz, thirty-eight, the third cook, was survived by his widow and two sons, age 33, 10 and 9 years respectively. The trial judge found that Cadiz survived for ten hours in the water before his death and awarded $3,000 for pain and suffering.
 
 
 17
 The district judge awarded to the widow and two children a total of $51,750 for loss of contributions resulting from Cadiz's death, based upon the finding that Cadiz would have earned an average of $4,200 from 1955 until he reached the age of sixty-five in 1981. In arriving at this finding, the district court relied in part upon a stipulation as to Cadiz's annual earnings for the period 1951 through 1954, indicating that these earnings averaged $4,300 per year. As neither the stipulation nor the record shed any light on whether the stipulated earnings represent Cadiz's income before taxes or after taxes, there is no basis for disturbing this finding of the district court.
 
 
 18
 Cadiz spent only six months on ship during each of the years 1952 and 1953, but was at sea seven of the nine months preceding his death in 1954. Accepting the trial judge's conclusion that Cadiz's improved industry, as evidenced by his work record in 1954, would probably have endured for but a few years, and taking into account that Cadiz had satisfactorily completed a course as second cook and baker barely a month before his death, we conclude that the finding as to Cadiz's probable earnings has substantial support in the record.
 
 
 19
 The district judge also awarded $750 per year to each child until that child reached twenty-one for loss of the care, guidance and training of a father. There is sufficient evidence in the record of the deceased's good character and the interest which he took in his children to justify an award for loss of nurture. Since the awards are not clearly excessive, they must be affirmed.
 
 
 20
 We reduce the damages for pain and suffering from $3,000 to $1,500.
 
 
 21
 The sum of $5,300 paid under a seamen's insurance policy was properly offset against the award. Consequently the total award is reduced from $65,380 to $63,880.
 
 Claims for Injuries to Remy Rosario
 
 22
 Rosario, the boatswain, was forty-three years of age at the time of the sinking of the "Mormackite." He was rescued after forty-nine and one-fourth hours in the water. The district judge awarded $45,000 for "pain and suffering from the sinking to the present, and in the future, and for future psychiatric care." Since damages for pain and suffering while in the water were computed at the rate of $300 per hour, the award for post-rescue pain and suffering and for future psychiatric care comes to $30,225.
 
 
 23
 While we can easily segregate damages for pain and suffering while in the water from damages for pain and suffering after rescue, there must here be a remand since the district judge not only has not indicated what portion of the award is to pay the estimated cost of future psychiatric care and treatment but has also failed to indicate his method of computing the award for future psychiatric care.
 
 
 24
 For us to attempt to repair these omissions would require us to pass upon the credibility of the medical testimony. We think it inadvisable, whatever may be our power in this respect, to embark "without a pilot, rudder, compass or radar — on an amateur's voyage on the fog-enshrouded sea of psychiatry," Frank, J., concurring in United States v. Flores-Rodriguez, 2 Cir., 1956, 237 F.2d 405, 412, particularly since we have not had the benefit of hearing and observing the expert witnesses as did the trial judge. The district court should make findings in sufficient detail so that the parties may know how the awards have been computed and a meaningful review may be had, Dwyer v. Socony-Vacuum Oil Co., 2 Cir., 1960, 276 F.2d 653; Alexander v. Nash-Kelvinator Corp., 2 Cir., 1958, 261 F.2d 187, 191, by estimating the length of time during which psychiatric treatment would be required, the number of treatments necessary, and the cost of each treatment. The district court need not take into account the possible availability of free out-patient treatment in city clinics or hospitals or hospitals in other localities. It was conceded by Moore-McCormack that no public health service out-patient facilities equipped to render psychiatric treatment are available in the New York City area. Whatever benefits may be provided to the public at large or to Rosario by virtue of his employment by Bellevue Hospital must be considered as received from a "collateral source." See 2 Harper & James, Law of Torts, § 25.22 (1956). We do not think that Rosario may be required to mitigate by moving from his home to avail himself of free out-patient facilities elsewhere. No more is he to be expected to hospitalize himself merely because free hospitalization is available while free out-patient facilities are lacking. We do not here deal with the shipowner's right to mitigation for free medical care already received, particularly from institutions designed to ease the shipowner's ancient burden of furnishing maintenance and cure. See Ibid. and cases cited in the annotation at 68 A.L.R. 2d 876 (1959).
 
 
 25
 Also awarded to Rosario was $20,190 for loss of future earnings. We cannot tell whether the district judge postulated his finding of an average future annual wage loss of $1,700 on Rosario's annual average wage loss of $1,680 for the five years following the sinking or on the average annual loss of $1,360 for 1958 and 1959. Since there must be a remand in any event, we think the district judge should clarify the basis for his award for loss of future earnings. In calculating the average annual loss, the year 1955 during which Rosario worked only one month at sea and earned a total of $900 should be excluded from the calculation. As we have previously indicated, damages for pain and suffering while in the water should be allowed at the rate of $150 per hour.
 
 Claims for Injuries to Pedro De Jesus
 
 26
 Pedro De Jesus, a wiper on the "Mormackite," was fifty-two and one-half years of age at the time of the sinking. He was rescued after forty-nine and three-fourths hours in the water and was awarded $14,925 for what he thus endured.
 
 
 27
 The district court awarded $35,000 for "past and prospective pain and suffering and for future psychiatric care." The court made no findings from which we can tell how it arrived at the remainder of $20,075, and accordingly we must remand for more detailed findings in which the district court should indicate the extent to which it has taken into account De Jesus' extensive prior medical history.
 
 
 28
 The award of $9,100 to De Jesus for loss of future earnings also cannot stand upon the present findings. In January and in August 1957 De Jesus was declared temporarily unfit for sea duty. Finally, in July 1958 he was found unfit for sea duty for an indefinite time and advised to seek employment ashore. He has not heeded that advice. The record does not show to what extent the award for loss of future earnings is based upon an actual disability and/or upon an unavailability of work ashore rather than upon De Jesus' unwillingness to seek employment ashore. Cf. Wiseman v. Sinclair Refining Co., 2 Cir., 1961, 290 F.2d 818.
 
 Claims for Injuries to Tadeo Del Valle
 
 29
 Del Valle, an able-bodied seaman on the "Mormackite," was fifty-five years of age at the time of the sinking.
 
 
 30
 The district court awarded Del Valle $35,000 for "past and future pain and suffering, and permanent mental illness," of which $14,700 was for the forty-nine hours he spent in the ocean before rescue. Therefore the award for post-rescue pain and suffering and for permanent mental illness amounted to $20,300.
 
 
 31
 The uncontradicted medical testimony at the trial showed that Del Valle was suffering from a permanent mental disability. This was amply corroborated by the other evidence. In January 1956 Del Valle entered a Veteran's Hospital, the records of which state that he was then suffering from a "schizophrenic reaction, paranoid type, moderately severe" precipitated by the foundering of the "Mormackite." The degree of incapacity is there given as "severe" and the prognosis "guarded." The Veteran's Administration granted the claimant a full disability pension (which he is still receiving) in connection with the resulting "complete and service-connected" disability. Del Valle was hospitalized a total of seven months in September 1956. On September 26, 1957, Moore-McCormack rejected an application for employment by the claimant on the ground of "mental disorder." It is conceded by Moore-McCormack that the "Mormackite" experience "caused or materially contributed" to the claimant's breakdown in 1956. Del Valle has not been at sea since January 6, 1958, but has lived on his savings on a seven acre farm in Puerto Rico.
 
 
 32
 We have fully considered Del Valle's history of prior mental disturbance and his prior partial incapacity. Nonetheless we conclude that the award, although quite liberal, is not clearly erroneous.
 
 
 33
 The award for pain and suffering prior to rescue must be reduced from $14,700 to $7,350 and the total award from $47,565 to $40,215. As so modified, the award is affirmed with interest from June 3, 1960.
 
 Pre-Judgment Interest
 
 34
 In their cross-appeals the four death claimants urge that the district court should have granted interest as damages from the date of death to the date of the decree, June 3, 1960, on the awards for pecuniary loss to the decedents' dependents,[5] as was done in National Airlines, Inc. v. Stiles, 5 Cir., 1959, 268 F.2d 400. The district court refused moratory interest (interest as damages), allowing interest only from the date of the decree. We conclude that these claims should be remanded to the district court for the allowance of pre-judgment interest. Cf. Newburgh Land & Dock Co. v. Texas Co., 2 Cir., 1955, 227 F.2d 732.
 
 
 35
 Damages for pecuniary loss are recoverable under the Death on the High Seas Act, 46 U.S.C.A. § 761 et seq. Section 761 provides that "the personal representative of the decedent may maintain a suit for damages * * * in admiralty." Under admiralty practice the district court has a measure of discretion in allowing and fixing moratory interest.[6]
 
 
 36
 Moore-McCormack urges several objections to the allowance of moratory interest: First, it is argued, the failure of the Congress to provide expressly for pre-judgment interest on claims in admiralty indicates an intent to preserve the ancient rule permitting pre-judgment interest on claims termed "liquidated" while denying it as to "unliquidated" claims such as those here in question. Second, it is contended that we should follow decisions in this circuit in actions at law under Jones Act and F. E. L. A. provisions (also not expressly providing for moratory interest) which have recognized that, at least at law, interest is not allowed for the period between occurrence of the tort and entry of judgment.[7] Third, it is urged that this court should, as a matter of policy, hold that pre-judgment interest may not be given on damages for pecuniary loss resulting from a tortious death.
 
 
 37
 If it was the intention of Congress to bar recovery of moratory interest on "unliquidated" death claims, we are of course bound. But the hoary distinction between "liquidated" and "unliquidated" claims, criticized by eminent authority well before the enactment in 1920 of the Death on the High Seas Act,[8] has never become so firmly entrenched in admiralty as it has been at law. The trend in admiralty prior to enactment of the statute had been toward allowance of pre-judgment interest on claims for negligent or wrongful death.[9] The Death on the High Seas Act merely instructs that "the recovery * * * shall be a fair and just compensation for the pecuniary loss sustained." 46 U.S.C.A. § 762. We see nothing in this language to indicate that the Congress did not intend that the damages should give full compensation for all pecuniary loss sustained including that resulting from delay in being compensated. See 36 A.L.R.2d 337, 345 (1954).
 
 
 38
 Awards for financial loss to dependents, as distinguished from damages for pain and suffering, are intended to compensate for a pecuniary deprivation.9a McCormick, Damages, § 56 (1935). There would seem to be no reason why the delay in receipt of compensation for pecuniary loss should not likewise constitute a "pecuniary loss." Cf. Frasier v. Public Service Interstate Transport Co., 2 Cir., 1958, 254 F.2d 132. There is surely considerable loss in having to wait over seven years before the judgment is entered and paid; this is the kind of loss for which compensation is customarily given by the payment of interest.
 
 
 39
 All the Jones Act and F. E. L. A. decisions denying pre-judgment interest to which our attention has been directed rest either upon specific statutory interpretation in the light of the formerly uncritical acceptance of the "liquidated-unliquidated" distinction at common law,[10] or on a rigorous interpretation of 28 U.S.C. § 1961,[11] a statute applicable only to civil cases which provides for interest from the date of entry of judgment.
 
 
 40
 The first F. E. L. A. was enacted in 1906,[12] when pre-judgment interest was generally limited to liquidated claims. This distinction was carried over into decisions under the Jones Act, perhaps with good reason in view of the latter statute's express incorporation of F. E. L. A. provisions. See 46 U.S.C.A. § 688. Both statutes provided for an action at law, with right to trial by jury, although Jones Act suits could also be brought in admiralty.[13] Both statutes envisaged a recovery for pain and suffering and for injuries to the date of trial and thereafter, the computation of interest on which might well be far more confusing to the average jury than to a judge. See National Airlines v. Stiles, supra, 268 F.2d at 406. In any event, no one would be so naive as to suppose that juries do not throw into the scales the years that a plaintiff may have had to wait before his case can be heard by a jury. The practical reason why the courts in jury cases have refused to grant moratory interest may therefore be found in the judicial recognition that a jury usually makes some allowance for loss caused by delay.[14] Likewise judges doubtless make some allowance for loss because of the law's delay. It would seem to us to be better to recognize this and have the computation made on a basis which is known and understood.
 
 
 41
 Interest was never refused on unliquidated claims from any doubt that some financial loss is actually suffered from delay in receiving money. Theoretically, refusal was based on the concept that interest was payable only on a "debt" and that no debt could be due until the liability had been fixed. See Frazer v. Bigelow Carpet Co., 1886, 141 Mass. 126, 4 N.E. 620. McCormick traces the distinction to a survival of the medieval distaste for interest as "usurious." McCormick, Damages, §§ 51, 55 (1935 Ed.). A further explanation sometimes advanced is that a debtor should not be burdened with pre-judgment interest upon an obligation so nebulous that he must necessarily look to the courts to fix its scope. Similar considerations would, however, seem to support the disallowance of pre-judgment interest where liability is in doubt as to a "liquidated" claim. But since the courts have not seen fit to deny pre-judgment interest in the latter case, we see no reason why they should not grant it in the former.
 
 
 42
 We think, therefore, that when a court fixes damages to compensate for a loss which occurred in the past, there should be some allowance for the period between the date of the loss and the date of the judgment. Recompense may thus be given for the further loss in the postponement of the receipt of compensation. In all too many instances the delay in reaching cases for trial brings suffering and privation to those who were dependent on the deceased. Even the more fortunate of the bereaved may have been forced to borrow money at interest to meet their expenses.14a
 
 
 43
 As ancient as the injured's plaint of "the law's delay,"[15] is the use of that delay as a means by which a defendant may obtain a more favorable settlement. But whether an action has been deliberately prolonged or not, the defendants who are ultimately directed to pay have had the use of the money declared to be due. If it be only fair to discount sums paid now on account of future loss which would not be due until some years in the future, see Chesapeake & Ohio R. R. Co. v. Kelly, 1918, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117; O'Connor v. United States, 2 Cir., 1959, 269 F.2d 578, 585, it is, by the same token, inequitable not to make appropriate compensation for delay in discharging the obligation. McCormick, Damages, § 56 (1935 Ed.). Here the delay is not the fault of the plaintiffs and while it may equally not be the fault of the defendant, the plaintiffs have lost and the defendant has benefited.
 
 
 44
 We do not think, however, that the claimants are necessarily entitled to pre-judgment interest at the full legal rate. Although the claimants are entitled to compensation for delay, the conduct of Moore-McCormack has not been, so far as we can now determine, either so reckless or so wanton as to justify imposition of a penalty. An allowance of interest at the full legal rate would seem based on the unrealistic assumption that the claimants would have invested all they received so skillfully as to yield a return above that given by prudent investments not requiring special skill and attention by the investor. It would thus appear that interest should properly be allowed at a rate, within the discretion of the district judge, which may well be something less than the full legal rate. Chemical Bank & Trust Co. v. Prudence Bonds Corp., 2 Cir., 1953, 207 F.2d 67, 77; King v. Talbot, 1869, 40 N.Y. 76. Since the allowance for loss of future benefits to the dependents of the four deceased men are discounted at 4%, it would seem appropriate for the district judge also to compute interest at a 4% rate on the allowances for pecuniary losses sustained prior to decree. Of course interest on sums past due will not run from the date of death, but from the several dates at which the sums would have accrued. See Danskin v. Pennsylvania R. R. Co., 1912, 83 N.J.L. 522, 83 A. 1006.[16]
 
 The Decree
 
 Right to Injunction
 
 
 45
 The district court refused to enjoin future prosecution of death and personal injury claims arising out of the foundering of the "Mormackite." Moore-McCormack claims that the court below erred in failing to include "the usual injunction" in its formal decree. We hold that, having failed in the attempt to limit liability on the seamen's claims, petitioner is not entitled as to such claims to further benefit from the Limitation Act. Consequently the injunction was properly refused.
 
 
 46
 It does not appear that any claimants failed to file in this proceeding; if any such there be, the applicable statute of limitations must, with possible rare exception, be presently a bar. Claimants who have appeared in the action are, of course, necessarily bound by settlement or by res adjudicata.
 
 
 47
 The hypothetical claimant who has not filed his claim has not complied with the directive language of Admiralty Rule 51, para. 3, 28 U.S.C.: "All persons having such claims must file them." [Emphasis supplied.] Were the policy of concourse, that is the ingathering of all possible claimants before a single forum, to be exalted above all else, a reasonable legislative scheme might possibly provide for forfeiture of unfiled claims. But the Congress has not seen fit to so decree and forfeiture is not lightly to be inferred. Concursus obtains so far as necessary to protect a petitioner's claim to limited liability and, if liability is limited and the fund inadequate, to enable the court to adjudicate between competing interests.[17] Once limitation is denied, a petitioner's defunct claim to limitation can plainly no longer be imperiled. Nor, save in the event of insolvency, is there a limited fund to be divided among competing claimants. The provisions of the Limitations Act, therefore, no longer control. As was said in Lake Tankers Corp. v. Henn, 1957, 354 U.S. 147, 153, 77 S.Ct. 1269, 1273, 1 L.Ed.2d 1246:
 
 
 48
 "It follows then that there can be no reason why a shipowner * * * should be treated any more favorably than an airline, bus, or railroad company. None of them can force a damage claimant to trial without a jury. They, too, must suffer a multiplicity of suits. Likewise, the shipowner, so long as his claim of limited liability is not jeopardized, is subject to all common-law remedies available against other parties in damage actions. The Act, as we have said, was not adopted to insulate shipowners from liability but merely to limit it to the value of the vessel and the pending freight."
 
 
 49
 Limitation was here granted only as to cargo claims. With respect to such claims the restraining order has been properly continued and made permanent. The seamen's claims were not to be similarly impeded, for once the shipowner is found not entitled to a limitation,
 
 
 50
 "* * * his liability will be unlimited and there will be no need for a concourse to marshal the various claims. In that event the claims will no longer be `subject to limitation' within the meaning of Admiralty Rule 51 and, therefore, any order denying the owner's right to limitation should contain provisions for lifting the restraining order. At that time the claimants may elect to pursue their claims to judgment in the admiralty court or pursue their rights under the Jones Act." In re Wood's Petition, 2 Cir., 1956, 230 F.2d 197, 199; see also Pershing Auto Rentals, Inc. v. Gaffney, 5 Cir., 1960, 279 F.2d 546, 552.[18]
 
 
 51
 But rather than depart from the forum, all personal injury and death claimants present in the action stipulated that the issue of damages might be tried to the admiralty court. We do not think that by so doing they have subjected themselves to the extraordinary sanction of an injunction, a safeguard to which petitioner would plainly not be entitled had these claims been prosecuted elsewhere.
 
 
 52
 Nor are hypothetical claims not yet presented to be barred from proper forums. Those who failed to file in response to the monition may not share in the limitation fund; had petitioner's right to limit been sustained, they would now be permanently enjoined from prosecuting their claims elsewhere. But limitation was denied; the injunction may not issue.[19]
 
 
 The Limitation Fund
 
 
 53
 The petitioner also urges that the limitation fund should be divided pro-rata among all the claimants: death, injury and cargo. Limitation has here been granted as to the cargo claimants but not as to the seamen claimants who "may, having reduced their claims to judgment, reach by normal process any of the owner's available assets." Gilmore & Black, Law of Admiralty, § 10-40 (1957 Ed.); see Benedict, Admiralty, § 527 (6th Ed.). Under the thesis advanced, death and injury claimants with access to a "fund" ample to satisfy their judgments, for it does not appear that Moore-McCormack is insolvent, would be required to first dip into a fund, already pitifully inadequate, to the great prejudice of the cargo claimants who are without other recourse. The proper answer, we think, was given in The Virginia, D.C.Md.1920, 266 F. 437, 439: "If the petitioners were insolvent, the passengers would be doubtless entitled to share in the proceeds of the res; but that would be their right, and not that of the shipowners."[20]
 
 
 54
 A limitation proceeding is "the administration of equity in an admiralty court" and "all the ease with which rights can be adjusted in equity is intended to be given to the proceeding." Hartford Accident & Indemnity Co. of Hartford v. Southern Pacific Co., 1927, 273 U.S. 207, 216, 47 S.Ct. 357, 359; see also British Transport Comm. v. United States, 1957, 354 U.S. 129, 137, 77 S.Ct. 1103, 1 L.Ed.2d 1234; Just v. Chambers, 1941, 312 U.S. 383, 386-387, 61 S.Ct. 687. It follows, therefore, that the equitable doctrine of marshalling assets prevails in a court of admiralty and that, not only may not the shipowner insist that no-limitation claimants deplete the limitation fund, but it is the positive duty of the court to protect the cargo claimants by requiring the death and injury claimants first to look for satisfaction of their judgments to funds which the limitation claimants cannot reach. See Cargill Grain Co. v. Buffalo Barge Towing Corp., D.C.S.D.N.Y.1940, 1941 A.M.C. 122, 128-130.
 
 
 55
 The argument that the "Morro Castle" amendments to the Limitation Act[21] and especially 46 U.S.C.A. § 183(b) were in some way intended to alter the foregoing principles is without merit. Section 183 (b) merely provides that where limitation is granted, that portion of the fund available to personal injury and death claimants, if inadequate to provide them full reimbursement, will be increased to $60 per ton under certain circumstances. See H.R.Rep.No.2517, 74th Cong., 2d Sess. (1936); Gilmore & Black, Admiralty, § 10-33. Since it is clear that the other assets of the petitioner are, so far as the no-limitation claimants are concerned, in no sense a mere supplement to the fund but rather the primary source from which such claims should be satisfied, any attempt to analogize the present case to one arising under § 183(b) must fail.
 
 
 56
 There being no showing that Moore-McCormack is now insolvent, the death and personal injury claimants have no rights in the limitation fund. A fortiori the petitioner may not share pro-rata in the fund by standing in the shoes of death and personal injury claimants with whom it has already settled.[22]
 
 
 Cost of Trial Transcript
 
 
 57
 The petitioner contends that the district court erred in taxing the cost of counsel's copy of the trial minutes. We do not agree.
 
 
 58
 During the trial of this action some 7,000 pages of testimony were taken. The court at the outset directed that it be furnished daily copy. The extended nature of the trial at each phase of the proceeding and the complicated fact picture demanded careful and accurate reference to the testimony. We do not think it unreasonable under the circumstances for the trial judge to find it at least as necessary for counsel for the claimants to be provided with daily transcript as for the court itself to receive such copy.
 
 
 59
 Although at law, see Straus v. Victor Talking Mach. Co., 2 Cir., 1924, 297 F. 791, in equity, see Stallo v. Wagner, 2 Cir., 1917, 245 F. 636, and in admiralty, see The William Branfoot, 4 Cir., 1892, 52 F. 390 (per Chief Justice Fuller), the amount paid for a litigant's copy of the trial transcript was not formerly taxable, the Court Reporters Act of 1944, 58 Stat. 5, January 20, 1944, c. 3, § 1(e), expressly provided: "In the discretion of the court any part or all of the fees for transcripts may be taxed as costs in the case." Although this provision was not expressly carried forward in the Judicial Code of 1948, its substance appears in 28 U.S.C. § 1920: "A judge or clerk of any court of the United States may tax as costs * * * (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case. * * *" Petitioner contends, however, that this statute does not apply to costs in admiralty by reason of 28 U.S.C. § 1925 which vests the rule-making power as to costs in admiralty in the Supreme Court. The latter provision, however, expressly saves all provisions as to costs enacted by the Congress. For this reason we need not consider the continued validity of the interpretation given to the language of Admiralty Rule 46 in the Stallo case, supra.[23] See 6 Moore Federal Practice
 
 
 60
 54.77(7). We are of the opinion that it was not an abuse of the trial judge's discretion to tax against the petitioner the cost of a copy of the trial minutes used by counsel for the claimants.
 
 
 61
 The awards to Sullivan, Henry, Hernandez, Williams and Del Valle are modified in accordance with this opinion and as modified are affirmed. The De Jesus and Rosario claims are remanded to the district court for further proceedings in accordance with this opinion. The Richardson, Wall, Berk and Cadiz awards are modified and remanded for determination of pre-judgment interest in conformance with this opinion.
 
 
 
 Notes:
 
 
 *
 Sitting by designation
 
 
 [1]
 Originally there were 48 death and personal injury claims. Of these 21 were settled prior to trial, 14 during the trial, and 2 pending this appeal, leaving the 11 claims now before us
 
 
 [2]
 See e. g., cases collected at 16 A.L.R.2d 3-390 (1951); 16 A.L.R.2d 393-458; 17 A.L.R.2d 832, 864-867 (1951); 17 A.L.R. 2d 872, 879-880 (1951)
 
 
 [3]
 The district judge employed, and we approve, this method in computing present value with respect to the other claims
 
 
 [4]
 Not challenged is the award to the parents of $5,000 for contributions lost during the years 1955 through 1959
 
 
 [5]
 No claim is made for interest on damages awarded for the seamen's conscious pain and suffering prior to death. The personal injury claimants have not cross-appealed from the decree which allowed them interest only from the date of the decree, June 3, 1960
 
 
 [6]
 See, e. g., The Wright, 2 Cir., 1940, 109 F.2d 699; Afran Transport Co. v. The Bergechief, 2 Cir., 1960, 285 F.2d 119; Geotechnical Corp. of Delaware v. Pure Oil Co., 5 Cir., 1954, 214 F.2d 476; The President Madison, 9 Cir., 1937, 91 F.2d 835; cases collected in 36 A.L.R.2d 337, 354-356, 358-364 (1954), supplementing 96 A.L.R. 18, 20-30, 32-42 (1935)
 
 
 [7]
 See Casey v. American Export Lines, 2 Cir., 173 F.2d 324, reversed 2 Cir., 1949, 176 F.2d 337; Cortes v. Baltimore Insular Line, Inc., 2 Cir., 1933, 66 F.2d 526
 
 
 [8]
 1 Sedgwick, Damages, § 300 (9th Ed. 1913):
 "But the objection to this classification lies not only in its difficulty of application * * * but in the fact of its unfairness. There is no reason why a person injured should have a smaller measure of recovery in one case than the other * * * On general principles, once admitted that interest is the natural fruit of money, it would seem that wherever a verdict liquidates a claim and fixes it as of a prior date, interest should follow from that date."
 
 
 [9]
 Compare Thompson Towing & Wrecking Ass'n v. McGregor, 6 Cir., 1913, 207 F. 209, 221 and Union Steamboat Co. v. Chaffin's Adm'rs, 7 Cir., 1913, 204 F. 412 with Burrows v. Lownsdale, 9 Cir., 1904, 133 F. 250
 9a. We consider the allowances for loss of nurture as "awards for financial loss to dependents." The guidance of a parent in matters material, moral and spiritual is of a definite practical and financial value and is subject to pecuniary estimate. Michigan Cent. R. R. Co. v. Vreeland, 1913, 227 U.S. 59, 71, 33 S.Ct. 192, 57 L.Ed. 417; Briscoe v. United States, 2 Cir., 1933, 65 F.2d 404; see Meehan v. Central R. R. Co. of N. J., D.C.S.D.N.Y. 1960, 181 F.Supp. 594, 606, 607, 621; cf. Sabine Towing Co. v. Brennan, 5 Cir., 1936, 85 F.2d 478; accord Rogow v. United States, D.C.S.D.N.Y.1959, 173 F. Supp. 547, 561. See also 2 Harper & James, The Law of Torts, § 25.14 (1956); McCormick, Damages, § 99 (1935).
 
 
 [10]
 Casey v. American Export Lines, supra, note 7; Cortes v. Baltimore Insular Line, Inc., supra, note 7; Louisiana & Arkansas R. R. Co. v. Pratt, 5 Cir., 1944, 142 F.2d 847, 153 A.L.R. 851; Cleveland Tankers v. Tierney, 6 Cir., 1948, 169 F.2d 622; Lynott v. Great Lakes Transit Corp., 4th Dept. 1922, 202 App.Div. 613, 195 N.Y.S. 13, affirmed 1922, 234 N.Y. 626, 138 N.E. 473
 
 
 [11]
 Compare: Briggs v. Pennsylvania R. R. Co., 2 Cir., 1948, 164 F.2d 21, 23, 1 A.L.R.2d 475, affirmed on other grounds, 1948, 334 U.S. 304, 68 S.Ct. 1039, 92 L.Ed. 1403, with President & Directors of Manhattan Co. v. Kelby, 2 Cir., 1945, 147 F.2d 465, certiorari denied 1945, 324 U.S. 866, 65 S.Ct. 916, 89 L.Ed. 1422; see also Powers v. New York Central R. R. Co., 2 Cir., 1958, 251 F.2d 813, 76 A.L.R.2d 1207; Murphy v. Lehigh Valley R. R. Co., 2 Cir., 1946, 158 F.2d 481; Louisiana & Arkansas R. R. Co. v. Pratt, supra, note 10; Cleveland Tankers v. Tierney, supra, note 10
 
 
 [12]
 The Employers' Liability Act of June 11, 1906, c. 3073, 34 Stat. 232, declared unconstitutional in the Employers' Liability Cases (Howard v. Illinois Cent. R. Co.), 1908, 207 U.S. 463, 28 S.Ct. 141, 52 L.Ed. 297, was re-enacted with slight alteration to meet constitutional objections, April 22, 1908, c. 149, 35 Stat. 65
 
 
 [13]
 We do not reach the question, unresolved in this circuit, as to whether interestqua damages may be given upon any portion of the recovery in a Jones Act suit brought in admiralty. See discussion in Moore-McCormack Lines, Inc., v. Amirault, 1 Cir., 1953, 202 F.2d 893.
 
 
 [14]
 Cf. Frasier v. Public Service Interstate Transport Co., 2 Cir., 1958, 254 F.2d 132. See also Powers v. New York Central Railroad Co., 2 Cir., 1958, 251 F.2d 813, 819, 76 A.L.R.2d 1207 [dissent]; 64 Yale L.J. 1019 (1955); Restatement, Torts, § 913(2)
 14a. That an award of interest is necessary to fully indemnify a plaintiff whose property is lost through the defendant's willfulness or negligence was recently recognized in principle by all the judges of the New York Court of Appeals in Purcell v. Long Island Daily Press Pub. Co., 1961, 9 N.Y.2d 255, 213 N.Y.S.2d 425, 173 N.E.2d 865. See also Flamm v. Noble, 1947, 296 N.Y. 262, 72 N.E.2d 886, 171 A.L.R. 812. Although the federal courts do not go so far as New York and give interest on death claims from the date of death as a matter of right, see New York Decedent Estate Law § 132, we note that although an admiralty judge has discretion to refuse an award of interest "the award is to be made whenever damages lawfully due are withheld, unless there are exceptional circumstances to justify the refusal." The Wright, supra note 6, 109 F.2d 699, 702.
 
 
 [15]
 Shakespeare, Hamlet, Act III, Sc. 1 is but a modern version
 
 
 [16]
 Until entry of the decree on mandate no duty to pay the judgment rate of interest on the unliquidated compensatory interest (which, as we have noted, is an element of damages) can arise. Chemical Bank & Trust Co. v. Prudence Bonds Corp., 2 Cir., 1954, 213 F.2d 443. Here compensatory interest will run from the several beginning dates up to and including the date of entry of the decree on mandate, save to the extent the running of compensatory interest has been tolled by payment of principal into the registry of the district court or to a claimant's proctor, and will not cease to run as of June 3, 1960, the date of the original decree
 Thus, if $1,000 was due five years prior to entry of the original decree, and if $900 was paid into the registry at the time of the original decree, and the decree on mandate issues one year after the original decree, $200 moratory interest would be due on the $1,000, a further $4 would be due on the $100 balance and interest would run at 6% on the total due ($304) from the date of entry of the decree on mandate.
 In setting off payments by petitioner or on seamen's policies against the awards, it is to be presumed, unless the terms of payment are otherwise, that each payment was intended to apply against that portion of the award most in arrears.
 
 
 [17]
 Providence & N. Y. S.S. Co. v. Hill Mfg. Co., 1883, 109 U.S. 578, 3 S.Ct. 379, 617, 27 L.Ed. 1038; Butler v. Boston Steamship Co., 1889, 130 U.S. 527, 9 S.Ct. 612, 32 L.Ed. 1017; The "Scotland," 1881, 105 U.S. 24, 26 L.Ed. 1001; Ex parte Slayton, 1881, 105 U.S. 451, 26 L. Ed. 1066
 
 
 [18]
 See Hartford Accident & Indemnity Co. of Hartford v. Southern Pacific Co., 1927, 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612; Just v. Chambers, 1941, 312 U.S. 383, 668, 61 S.Ct. 687, 85 L.Ed. 903; Spencer Kellogg & Sons v. Hicks, 1932, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903. As was noted in Wood's Petition, supra, 230 F.2d at pages 199-200, note 10, these cases merely establish the continuing jurisdiction in admiralty to dispose of the remaining issues at the behest of the claimants after denying limitation. It was recognized in Maryland Casualty Co. v. Cushing, 1954, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806, that restrained actions might, under certain circumstances, be continued elsewhere once limitation proceedings had been concluded
 
 
 [19]
 Petitioner contends that "there can be no doubt" as to its right to a perpetual injunction against persons who have filed claims herein which have been settled. In The Foscolino, 5 Asp. 420 (P.D.1885), the sole case on which petitioner relies, limitation had been granted
 
 
 [20]
 See Gilmore & Black, supra, § 1040, as to the problems posed in insolvency situations
 
 
 [21]
 49 Stat. 960, c. 804 (1935); 49 Stat. 1479, c. 521 (1936)
 
 
 [22]
 It is unnecessary to our decision to pass upon the nature of the right, if any, to share in the limitation fund which a shipowner may derive from settled claims of a class as to which limitation is granted. See Article 3(3), International Convention Relating to the Limitation of the Liability of Owners of Seagoing Ships — 1957, A.M.C. 1972, 1974; Marsden's Collisions at Sea, page 202 (10th Ed. 1953) and cases cited therein
 
 
 [23]
 Stallo dealt with former Equity Rule 50, 226 U.S. 662