Evelyn WEEKS, surviving spouse of Norman Lee Weeks, Sr., deceased, Plaintiff-Appellant,

v.

ALONZO COTHRON, INC., Alonzo Cothron, S. A. Ekblom, Jr., and E. R. Albury, Jr., Defendants-Third Party Plaintiffs-Appellees,

v.

AMERICAN MUTUAL LIABILITY INSURANCE COMPANY and Matson Surety, Inc., Third Party Defendants-Appellees.

No. 73–1095.

United States Court of Appeals,
Fifth Circuit.

April 29, 1974.

Rehearing Denied June 10, 1974.

Oliver Wiley Folmar, Vacation Village, Fla., Oliver W. Brantley, Troy, Ala., Clinton Green, Miami, Fla., for plaintiff-appellant.

Duane Anderson, Miami, Fla., for third party plaintiff.

Thomas J. Schulte, Miami, Fla., for American Mut. Liability.

Melvyn G. Greensphan, Miami, Fla., for Matson Surety.

Jeanne Heyward, Miami, Fla., for Cothron and others and American Liability Ins. Co.

Before THORNBERRY, GODBOLD and CLARK, Circuit Judges.

GODBOLD, Circuit Judge:

This is the third appeal in this case, brought pursuant to the election provision [1] of the Longshoremen's and Harbor Workers' Act, 33 U.S.C. §§ 901–950, against an employer-shipowner who failed to "secure payment of compensation as required."

The suit, alleging negligence, was brought by the widow in April 1969, for damages for the death, occurring in the navigable waters of Florida, of Norman Lee Weeks, Sr., a nonseaman. The District Court dismissed for want of subject matter jurisdiction. On appeal we reversed,[2] holding that the District Court sitting in admiralty had jurisdiction by reason of the Florida wrongful death statute which covered claims arising from negligence occurring on the navigable waters of Florida. We noted that the cause of action was not based upon unseaworthiness and that our decision in Moragne v. States Marine Lines, Inc., 409 F.2d 32 (CA5, 1969), was then pending before the Supreme Court after grant of certiorari. In Moragne we had held, pursuant to the Florida Supreme Court's answer to our certified question, that the Florida wrongful death statute

did not give rise to an unseaworthiness cause of action for the wrongful death of a longshoreman on the navigable waters of Florida. Thereafter the Supreme Court decided Moragne,[3] holding that an action lies under general maritime law for death caused by unseaworthiness of a vessel on state navigable waters without regard to the limited scope of the state wrongful death statute. Plaintiff then amended her complaint to add a claim based on unseaworthiness. Following a nonjury trial, the court denied relief on both grounds.

On the second appeal [4] we again reversed, holding that there was liability based on unseaworthiness (and pretermitting consideration of negligence), and remanded for determination of damages. From a damage award of $38,855.39 plaintiff again appeals.

I.   Contributory negligence

Plaintiff's damages should not have been reduced by 50% on the basis of decedent's contributory negligence.

The employer-defendant and the decedent were subject to the Longshoremen's Act, and since the employer failed to secure payment of compensation as required, the plaintiff could elect, under 33 U.S.C. § 905, to "maintain an action . . . in admiralty for damages on account of such . . . death." Id. Plaintiff made that election. She alleged Cothron's obligation to secure payment of compensation and its failure to do so. Cothron contended that it did carry prescribed insurance coverage, and impleaded its compensation carrier as a third-party defendant. The policy on its face showed, however, that there was no coverage for claims under the Act, so defendant amended its third-party complaint to request reformation of the policy and impleaded its insurance agent, alleging that the agent had been in-

1.  33 U.S.C. § 905.

2.  Weeks v. Alonzo Cothron, Inc., 426 F.2d 674 (CA5, 1970).

3.  Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

4.  Weeks v. Alonzo Cothron, Inc., 466 F.2d 578 (CA5, 1972).

structed to secure the prescribed coverage but had negligently failed to do so. The District Court found that the defendant did not carry the required coverage but allowed indemnity over against the insurance agent and the compensation carrier. Thus it is clear that throughout the proceedings plaintiff has prosecuted this action pursuant to the election provisions of § 905. The unambiguous command of § 905 is that in a suit allowed to be maintained by that section contributory negligence may not be urged in defense. The sentence following the language allowing an action in admiralty, quoted above, states:

> In such action the defendant may not plead as a defense . . . that the injury was due to the contributory negligence of the employee.

■ Appellee concedes that § 905 abolishes contributory negligence as a bar to the suit if the claim sounds in negligence but argues that where the claim sounds in admiralty § 905 does not abolish the application of decedent's negligence as an element of calculating damages under the admiralty concept of comparative negligence. This construction, unsupported by authority and contrary to the language of § 905, would erode the purpose of that section as an inducement for employers to secure compensation,[5] and it is contrary to our holding on the second appeal when, having concluded that the vessel was unseaworthy, we did not deal with the theory of negligence, saying, "The determination of damages on remand would be the same, regardless of the theory of recovery." 466 F.2d at 580.

■ Finally, appellee suggests that the present action could be maintained by virtue of a judicially created exception to the Longshoremen's Act's exclusivity provision and that, therefore, the § 905 exception with its attendant disallowance of contributory negligence as a defense is inapplicable. In Reed v. S.S. Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L. Ed.2d 448 (1963), the Supreme Court held that despite the Longshoremen's Act's provision that compensation liability of an employer under the Act is exclusive and in lieu of all other liability on his part, one employed by a shipowner as a longshoreman can sue the employer-shipowner for the ship's unseaworthiness. See also Jackson v. Lykes Bros. S.S. Co., Inc., 386 U.S. 731, 733, 87 S.Ct. 1419, 1421, 18 L.Ed.2d 488, 490 (1967); Scopaz v. S.S. Santa Luisa, 372 F.2d 403 (CA2, 1967). Thus *Yaka* provided an exception to exclusivity which applies whether or not the employer-shipowner has secured compensation under the Act. Since the present case involves an employer who was also the shipowner, appellee would have us conclude (1) that this suit is pursuant to the *Yaka* exception and (2) that in suits pursuant to *Yaka*, the general maritime law principle of comparative negligence applies. We need not decide whether comparative negligence applies in suits pursuant to *Yaka*, however, for whether or not this is such a suit it is also an action brought pursuant to § 905 and, consequently, an action to which that section's disallowance of certain defenses, including the defense of contributory negligence, applies. Even if comparative negligence applies in pure *Yaka* suits, the concurrent applicability of the § 905 exception must operate to render that doctrine inapplicable. If it did not so operate, § 905 could not serve as an incentive to employers-shipowners to secure compensation in accordance with the Longshoremen's Act since they could lose nothing by failing to secure compensation. In granting longshoremen the ability to sue employers-shipowners for unseaworthiness, *Yaka* did not re-

---

5. See Gould v. Bird & Sons, Inc., 5 Wash.App. 59, 485 P.2d 458 (1971). Almost all American compensation acts permit the employee to sue the employer who has rejected or failed to comply with the act, and almost invariably as part of such permission to sue the employer is deprived of his common law defenses of assumption of risk, contributory negligence and negligence of a fellow servant. Schweitzer, Workmen's Compensation Law (perm. ed.) § 91.

strict the rights of longshoremen authorized to sue "in admiralty" under § 905 or undermine the incentive provided by that section to compliance by employers with the compensation scheme established by the Act.

## II. Damages to the wife

■ The cause of action in this case, both before and after amendment of the complaint, was asserted pursuant to the election provision of § 905.[6] An argument can be constructed that § 905 creates for longshoremen employees of a shipowner a statutory cause of action for wrongful death arising from unseaworthiness, rather than simply allowing assertion of such a cause derived from another source, and that the incidents and contours of this statutory cause of action are not necessarily the same as those of the judicially created *Moragne* cause of action against a shipowner for wrongful death arising from unseaworthiness. We are unable to accept such a construct as relevant here. Whether or not § 905 created an unseaworthiness cause of action for a longshoreman's wrongful death which existed prior to *Moragne,* in the circumstances of this post-*Moragne* case an admiralty cause of action for wrongful death occurring in a state's territorial waters asserted pursuant to § 905 must conform to the shape of a cause of action under *Moragne* except to the extent that § 905 expressly modifies those contours.[7] To hold otherwise would be to further complicate, without reason, the already recondite subject of the scope of damages under *Moragne.* A contrary holding would also run counter

to the analysis of Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, and Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), employed by the Supreme Court in Reed v. S.S. Yaka, *supra.*[8]

Because *Moragne* standards apply, the District Court must reconsider the damages awarded to the decedent's widow. Those damages were determined under the standard of "fair and just compensation for the pecuniary loss sustained," a standard drawn from the Death on the High Seas Act[9] and from Jones Act cases. The recent Supreme Court discussion of *Moragne* damages contained in Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974) indicates that such damages comprise elements beyond those included in the DOHSA standard. *Id..* at 583–592, 94 S.Ct. at 814–818, 39 L.Ed.2d, at 20–24. Damages awarded to the widow must be reconsidered in light of *Gaudet.*

## III. Damages to children

The trial judge denied relief to the two minor children on the grounds that they were not parties to the suit, that neither testified, and that the pecuniary value of their loss of nurture and guidance was not established.

■ The children should not be denied relief because they were not named as parties. Section 905 provides that an elective death action brought pursuant thereto shall be by decedent's "legal representative." It is not necessary for us to decide whether this is a word of art referring to a duly appointed administrator or executor, because no question

---

6. In the District Court's opinion and order now before us the court erroneously stated that the suit was not brought pursuant to the Act. In its findings made in connection with the judgment involved in the second appeal the court had correctly found that the suit as amended was brought pursuant to the Act.

7. It is not apparent that § 905 modifies the cause of action, as distinguished from the defenses which may be asserted, at all.

8. The Supreme Court's holding in *Yaka* may be modified by a 1972 amendment to the Longshoremen's Act adding subsection (b) of 33 U.S.C. § 905. Since this case arose prior to the amendment, we do not consider what impact, if any, it would have on our analysis here.

9. 46 U.S.C. § 762.

has been raised of the widow's standing to sue. For purposes of this case at least we must assume that the widow is the appropriate "legal representative" entitled to sue for "damages on account of such . . . death," 33 U.S.C. § 905, including any damages that the gloss of *Moragne* and *Gaudet* permit her to collect for and on behalf of the minors. The District Court may protect the children's interests in any such awards through the entry of appropriate protective orders.

■ While the District Judge noted that the children did not testify, we do not believe their testimony was necessary nor do we understand the District Court's opinion to hold that it was. Their mother, the plaintiff widow of the decedent, described in some detail the nature of the nurture and guidance provided by their father.

As we understand it, the thrust of the District Court's holding was not that the nature of the father's nurture and guidance was inadequately defined, but rather that the plaintiff submitted no evidence of a quantifiable "pecuniary" value which could be assigned to the nurture and guidance.[10] The District Court derived its requirement that such evidence be submitted from Michigan Central Railroad Co. v. Vreeland, 227 U.S. 59, 33 S.Ct. 192, 57 L.Ed. 417 (1913). But Vreeland was a case under the FELA limiting recovery thereunder to "pecuniary" loss, a limitation which, as we noted earlier,[11] *Gaudet* refused to apply mechanically to *Moragne* actions. Thus the District Court must reconsider the applicability of *Vreeland* to this case.[12] The District Court should permit proof to be offered on the issue of the monetary value of the children's loss of nurture and guidance, if, in the view of the District Judge, such evidence is necessary.

## IV. Life expectancy

■ Decedent was age 50 at the time of death in August 1968. He was employed as a member of a three-man crew pumping water out of a barge and applying patches to its leaks. He died when, wearing a diving mask, he dove under the barge to insert a patch and bolt into a leaking spot. His life expectancy under standard tables was 23 years. Plaintiff's expert computed the future value of decedent's earnings on an expectancy of his working 15 years to age 65, assuming that he was in good physical condition and would be able to perform heavy manual work until age 65. The expert admitted on cross-examination that his ultimate monetary average would be altered or modified depending upon specific case history as to decedent's previous earning ability and capacity, his ability to perform the work required of him and his ability to hold a job by reason of health. He acknowledged that a previous existing infirmity that would have very much impaired decedent's ability to work at the same pace and at the same labor would alter his opinion and could be "a pertinent factor." The trial court concluded:

> In fact, there is a very serious question as to whether or not he would have lived to age 65 with his heart

---

10. Despite the finding of lack of proof the court noted that if these elements had been properly pleaded and proved he would have awarded $6,000 to the minor son and $2,500 to the minor daughter. Obviously, if there was insufficient evidence of pecuniary value these figures are purely hypothetical.

11. See section II, *supra*.

12. Additionally, we note that *Vreeland* itself deals with damages for minor children's loss of nurture and guidance only in dictum, that it mentions such damages at all to distinguish them from a spouse's loss of "care and advice," and that it does not in and of itself unambiguously require that the monetary value of the nurture and guidance lost should be a subject of proof. Whether such a requirement has been imposed by *Vreeland*'s progeny or whether the requirement should be inferred from *Vreeland* are, of course, distinct questions which, because of their interrelation with the questions raised by *Gaudet*, we leave open for determination by the District Court.

condition and drinking problem. The greater weight of the credible evidence indicates, and I so find, that the deceased would not have worked past age 60, or a total of ten years, if, in fact, he lived that long from the date of his death.

Weeks' two brothers died of heart attacks at the age of 43 and 46, his father died of a stroke and his mother was a diabetic. He smoked two or three packages of cigarettes a day, and, according to his doctor's notes had a "heavy alcohol intake" which the doctor characterized as half a pint of liquor daily. He had a slightly enlarged liver. In 1966 Dr. Cohn examined him for chest pains and referred him to a specialist in internal medicine. An EKG revealed an abnormal heart beat and inferior wall injury pattern, compatible with injury to the heart muscle. Hospitalization was prescribed because of a suspected coronary or coronary insufficiency based on the abnormal EKG with acute symptoms. Weeks refused hospitalization and alternatively the doctor prescribed two weeks bed rest and nitroglycerin. The internist testified that the heart muscle would heal with a scar but the basic disease would not disappear. In early 1967 Dr. Cohn saw Weeks again for symptoms of angina. Another doctor, a specialist in gynecology, examined Weeks approximately three months before his death for a life insurance policy, listened to his heart and perceived no abnormalities but took no EKG. Bearing in mind decedent's family history, his medical history, and the type of work he did, we are unable to say that the trial court erred in concluding that his work expectancy would not exceed 10 years.

## V. Interest

■ We cannot say that the District Court's award of only 4% as prejudgment interest was an abuse of discretion. See Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583 (CA2, 1961).

## VI. Mathematical differences

Plaintiff's expert testified to what decedent's earnings would have been to age 65. At one point he testified to a total of $86,692, but at another to underlying figures producing a total of $89,692. The District Court stated that the $86,692 figure was right, but in its own calculations (reducing the age-65 figure to an age-60 figure) appears to have actually used the higher figure. To avoid further differences of opinion on remand, we have examined the expert's testimony and conclude that the figure of $89,692 is the correct age-65 figure.

■ In reducing the award for decedent's future earnings to the 10 year life expectancy (age 60) figure, the District Judge appears to have taken two-thirds of the expert's figure for a 15 year life expectancy (age 65) period. Strictly speaking, the correct computation is more complex since the present value of future income becomes smaller the more remote in time the receipt of that income, so that deducting one-third of the total as the adjustment for eliminating the last five years would produce an excessive adjustment.

Thus the case is affirmed in part and reversed and remanded in part for reconsideration of damages. The plaintiff should, if she desires, be permitted to offer additional evidence in support of components of damage heretofore denied by the court, except for funeral expenses with respect to which at no time has any evidence been offered.