**SYMONETTE SHIPYARDS, LTD.,**
Appellant,

v.

**Lee CLARK et al., Appellees.**

**Lee CLARK et al., Appellants,**

v.

**SYMONETTE SHIPYARDS, LTD.,**
Appellee.

No. 22486.

United States Court of Appeals
Fifth Circuit.

Aug. 15, 1966.

W. F. Parker, Miami, Fla., for appellant.

Arthur Roth, Miami, Fla., for appellees.

Before WISDOM and COLEMAN, Circuit Judges, and HUGHES, District Judge.

HUGHES, District Judge.

This is the second appeal of the consolidated cases of Lee Clark, an injured person, and Ruby Koutumas, the administratrix of the Estate of Albert Zannino, deceased, against Symonette Shipyards, Ltd., (Symonette). The death case was filed under the Death on the High Seas Act[1] and the Jones Act[2] and suit for injury under the Jones Act and General Maritime Law.

The first question to be disposed of, raised by Koutumas, is whether the appeal by Symonette was timely filed. The record reveals that Symonette filed its notice of appeal twenty eight days after the trial court's denial of the motion for new trial which had been timely filed. Koutumas contends that the appeal should be dismissed because it was filed more than ninety days following the entry of final judgment. This Court in the recent case of Gulfstream Shipping Co., Ltd. v. Collins & Tolson, 356 F.2d 466 (5th Cir. 1966), decided this question adverse to Koutumas when it decided affirmatively the question of

"whether the period for seeking review [in an admiralty case] begins to run from the date of the court's denial of the motion for rehearing rather than from the date of the court's entry of the motion where the motion for rehearing is filed within the period allowed for appealing from the original judgment." 356 F.2d at 467.

On the first appeal, the facts surrounding the accident in which Zannino was killed and Clark was injured were ably summarized by the Court as follows:

"* * * Lee Clark, a minor, and Albert Zannino were two of six men who were employees of one Wilson who had a contract to erect certain petroleum product tanks in Haiti. Wilson arranged for the transportation of the tanks together with the necessary equipment to be used in their erection on a landing craft owned by Symonette Shipyards, Ltd. As a part of the agreement of transportation Symonette, acting through its proper representative, agreed with Wilson to transport the six men with the understanding that in order to comply with the laws of the Bahamas the men would have to be signed on as if they were members of the crew, although it was agreed that they should perform no duties for the ship. This subterfuge was to obviate the penalty that the ship would be subjected to if it carried passengers, since under the Bahama regulations it was not permitted

---

1. 41 Stat. 537 (1920), 46 U.S.C. §§ 761–768. Section 1 of the DHSA, 46 U.S.C. § 761 provides:

"Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued."

2. 41 Stat. 1007 (1920), 46 U.S.C. § 688, which provides:

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located."

to land with passengers. Included in the equipment put on board was a large crane, which both Wilson and the ship's captain understood was to be used by Wilson's men, including Zannino and Clark, to unload the ship when it arrived at its destination. Following a stop at Nassau for unloading of cargo, one Ryder, who had been designated by Wilson as being in charge of the Wilson group, caused several of his group to attach an additional length of boom to the boom of the crane. In order to do this it became necessary for the men to add length to the cable that held up the boom, which, of course, in turn held the cable that would be attached to the cargo for use. In order to lengthen this cable, the men, including Zannino and Clark, under Ryder's supervision, simply placed the ends of the two pieces of cable together and clamped them in a manner that a pull on either end of the cable would tend to cause them to separate. There was no loop made with the brackets or clamps fastened over the turned-back ends of the loop.

"All concede, and the trial court found, that the splicing was done in a manner that no one knowing anything about such an operation could countenance. * * * Thereafter, after the splice was tested by lifting against a cleat of the deck of the vessel, the crane was used to lift a hand truck. Zannino and Clark were on the deck from which the truck had been lifted and when a part fell off of it they jumped under the truck to recover the part, at which time the splice parted, the boom fell and the truck fell on the two men killing Zannino and injuring Clark." 330 F.2d at 555.

It is the contention of Symonette that since the accident happened on a ship registered in and flying the flag of the Bahamas and actually owned by a citizen of that country the trial court erred in applying the law of the United States rather than that of the Bahamas.

Reliance is placed by Symonette on Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), for its proposition that the "law of the flag" must govern. It is true that the Supreme Court held in *Lauritzen* that Danish law, the law of the flag, controlled, but in addition, the plaintiff there was a Danish citizen and had signed the ship's articles providing that the rights of crew members would be governed by Danish law and by the employer's contract with the Danish Seaman's Union of which the plaintiff was a member. The facts in this appeal are entirely different.

■■ Of the seven factors listed in *Lauritzen* as influencing the choice of law,[3] i. e., place of the wrongful act, law of the flag, allegiance of the injured, allegiance of shipowner, place of contract, inaccessibility of foreign forum, and the law of the forum, only two (law of flag and allegiance of the ship-owner) lend some support to Symonette's argument. In the context of this case, we believe the most significant choice of law factor to be the nationality of the injured and deceased seamen. As the Supreme Court indicated in *Lauritzen*, " * * * [E]ach nation has a legitimate interest that its nationals and permanent inhabitants be not maimed or disabled from self-support." 345 U.S. at 586, 73 S.Ct. at 930. In addition the ship's articles were signed in the United States and the contract between Symonette and Wilson to transport tanks and equipment was made in this country. The two seamen were part of a crew assembled by Wilson, an American businessman, for use on an enterprise of his located in Haiti. We are of the opinion that the citizenship of the seamen and the factors surrounding their employment are sufficient to justify applying the law of the United States.[4]

3. The broad principles of choice of law established for Jones Act cases in *Lauritzen* were declared equally applicable to cases arising under the General Maritime Law in Romero v. International Terminal Operating Co., 358 U.S. 354, 381–384, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959).

4. Symonette relies heavily on Tjonaman v. A/S Glittre, 340 F.2d 290 (2d Cir.), cert. denied, 381 U.S. 925, 85 S.Ct. 1561, 15

See Gilmore & Black, Admiralty § 6–64, at 388 (1957).

█ With reference to other factors mentioned in *Lauritzen* for the choice of law, while the forum is held in *Lauritzen* to be of little significance, it might be well to point out that in this case the law of the United States is established and easily determinable, whereas the evidence relating to the law of the Bahamas is vague and indefinite. We agree with the finding of the trial court that the testimony of the expert witness relating to Bahamian law did not establish "whether or not proof of negligence is necessary to maintain an action for unseaworthiness or whether or not the common law defenses are an absolute bar as opposed to mitigation of a damage award." We find no error in the trial court's ruling that the law of the United States should govern.[5]

In the first trial where the District Judge denied the seamen's claims for general damages, he found that the splice was negligently made but expressly held that the doctrine of seaworthiness did not apply. He concluded that the sole cause of the injuries to Clark and the death of Zannino was their "inattentively standing under the boom which they knew was sustained by a cable which had been spliced by inexperienced persons."

█ On appeal this Court determined that the district court erred in holding that the doctrine of seaworthiness did not apply for the benefit of the seamen. We directed that "the trial court * * *

---

L.Ed.2d 115 (1965), to support its argument that the governing law in the case should be that of the Bahamas. Although the seaman in *Tjonaman* was an American national, we believe the application of Norwegian law there was justified not merely because the vessel was a Norwegian flag ship, but also because the seaman had signed the Norwegian shipping articles in the office of the Norwegian Consulate General in New York and these articles provided expressly that the seaman's rights and duties would be governed by Norwegian law. The preponderance of connecting factors to the foreign jurisdiction in *Tjonaman* are simply not present in the pending case.

5. Even if Bahamian law were held to govern in this case, the District Judge correctly applied American maritime law in light of his finding, amply supported by the record, that Symonette had failed to prove the pertinent principles of Bahamian law. As Justice Frankfurter stated some years ago:

"It is true that this [Supreme] Court has on several occasions held international rules which had passed into the 'general maritime law' to be subject to judicial notice. * * * But where less widely recognized rules of foreign maritime law have been involved, the Court had adhered to the general principle that foreign law is to be proved as a fact." Black Diamond Steamship Corp. v. Robert Stewart & Sons, Ltd., 336 U. S. 386, at 396–397, 69 S.Ct. 622, at 628, 93 L.Ed. 754 (1949).

In view of the fact that no body of reported decisions of Bahamian cases exists and that the only source of Bahamian case law is found in the knowledge and memory of local practitioners, Symonette was obligated to present clear proof of the relevant legal principles if it hoped to apply such law. See United States ex rel. Zdunic v. Uhl, 137 F.2d 858, 861 (2d Cir. 1943); Rowan v. Commissioner of Internal Revenue, 120 F.2d 515, 516 (5th Cir. 1941); Liechti v. Roche, 198 F.2d 174, 176 (5th Cir. 1952); Tidewater Oil Co. v. Waller, 302 F.2d 638, 640 (10th Cir. 1962); McCormick, Evidence § 326, at 698–701 (1954); 9 Wigmore, Evidence § 2573 (3d ed. 1940, Supp.1964); Ehrenzweig, Conflict of Laws § 129, at 365–66 (1962). In the absence of sufficient proof to establish with reasonable certainty the substance of the foreign principles of law, the modern view is that the law of the forum should be applied. See Leary v. Gledhill, 8 N.J. 260, 84 A.2d 725 (1951); Seguros Tepeyac, S. A., Compania Mexicana v. Bostrom, 347 F.2d 168, 174–175 n. 3 (5th Cir. 1965); Todd Shipyards Corp. v. The City of Athens, 83 F.Supp. 67, 83 (D.Md.1949); Currie, On the Displacement of the Law of the Forum, 58 Colum.L.Rev. 964 (1958); Goodrich, Conflict of Laws § 83, at 149 (Scoles ed. 1964); Ehrenzweig, op. cit. supra, § 129, at 366–68. This is precisely what the District Judge did in this case, and we believe he was correct.

For a comprehensive and scholarly analysis of this question, see Seguros Tepeyec, S. A., Compania Mexicana v. Bostrom, supra, 347 F.2d at 174–175 n. 3 (Wisdom, J.).

consider the evidence touching on the negligence in the splicing and the negligence, if any, of the plaintiffs in reacting as they did when the boom was suspended above them in light of our holding that these plaintiffs were both entitled to the protection of the doctrine of seaworthiness." 330 F.2d at 557.

With this Court's determination that the doctrine of seaworthiness was applicable, it was the duty of the trial judge on remand to find whether the vessel was in fact unseaworthy, whether such unseaworthiness, if any, was a proximate cause of the injury of Clark and death of Zannino, whether Clark and Zannino were negligent, and if so, whether such negligence was a proximate cause of the injury and death.

In determining the correctness of the trial court's finding that Symonette breached its duty to furnish a seaworthy ship, it is necessary to examine the cases of the Supreme Court interpreting the doctrine of seaworthiness. We find that the decisions of the last twenty years clearly support the result. In the landmark case of Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944), the Court held a shipowner liable for an unseaworthy condition and declared that the duty to furnish a seaworthy ship is absolute and not based on negligence. The facts were that Mahnich was injured by the collapse of a staging, caused when a defective rope supporting it parted.

This theory of "absolute" liability was reiterated and further developed two years later in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). Justice Rutledge explained:

"[The character of the doctrine] is essentially a species of liability without fault, analogous to other well known instances in our law. * * * [T]he liability is neither limited by conceptions of negligence nor contractual in character." 328 U.S. at 94, 66 S.Ct. at 877.

*Sieracki* expanded the seaworthiness doctrine to cover longshoremen injured aboard a ship while doing work ordinarily performed by seamen. The stevedore in that case was loading cargo on the vessel when he was injured by the breaking of a shackle which caused a boom and tackle to fall.

Since the *Sieracki* case the Supreme Court decisions have reflected the absolute duty of the shipowner to furnish a seaworthy ship for seamen completely independent of his duty under the Jones Act to exercise reasonable care. In Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953), the doctrine of seaworthiness was extended to cover a carpenter who went on board to repair the ship's grain loading equipment, and in Alaska S. S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954) affirming per curiam, 205 F.2d 478 (9th Cir. 1953), to a stevedore who was injured by equipment brought aboard by the stevedore himself and over which the shipowner had no control.

As these cases indicate beyond any doubt the application of the doctrine of seaworthiness as thus evolved "is a complete divorcement of unseaworthiness liability from concepts of negligence." Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960).

In line with the above authorities we find substantial evidence to support the trial court's finding:

"[Symonette] breached the duty to furnish a seaworthy vessel when the master allowed the inexperienced seamen (by definition only) to use heavy equipment to move cargo about the vessel on the high seas in anticipation of unloading and thereby allowed an improper and dangerous splice to be made rendering one of the vessel's appurtenances unfit for the intended use. Such unseaworthy condition was a proximate cause of the injuries and death complained of."

The fact that the equipment did not belong to the shipowner or was not part of the ship's own equipment does not

alter the fact that the vessel had become unseaworthy. Alaska S. S. Co. v. Petterson, supra.

■ With reference to the negligence of Zannino and Clark, the record as a whole gives credence, one, to the finding of the trial judge that Zannino had considerable experience in connecting cable, and, two, that he actually made the defective connection. Clark's lack of experience as a rigger and his nonparticipation in the actual splicing reduce the degree of contributory negligence chargeable to him. The trial court's finding that Zannino's negligence in the manner in which he spliced the rigging and his walking under the trailer contributed 50% to his death and Clark's negligence in walking under the trailer contributed 25% to his injury finds support in the evidence and is certainly not clearly erroneous.

■ With reference to contributory negligence, it is the contention of Symonette that any negligence of the seamen bars their recovery for general damages while counsel for Clark and Koutumas suggests the possibility that contributory negligence cannot reduce the amount of damages awarded for unseaworthiness. Neither contention is supported by the cases.

The facts of the recent case of Ktistakis v. United Cross Navigation Corp., 2 Cir., 324 F.2d 728 (1963), cert. denied, 377 U.S. 915, 84 S.Ct. 1179, 12 L.Ed.2d 185 (1964), are similar to the present case in that Ktistakis was responsible in part for the unseaworthy condition which caused his injury. Plaintiff, the second mate of the ship, was in charge of work that included the emptying of spill tubs from time to time. The slippery condition from the dripping of the oil on the deck caused the fall and injury of the plaintiff. The trial court found the mate contributorily negligent and reduced the damages 50 per cent. While the effect of contributory negligence as a bar or to reduce damages was not raised, by affirming, the Court of Appeals necessarily rejected the theory that contributory negligence was a bar to

recovery and "approved the mitigation of damages by reason of the seaman's contributory negligence." 324 F.2d at 729.

The subsequent denial of the petition for certiorari by the Supreme Court, Ktistakis v. United Cross Navigation Corp., 377 U.S. 915, 84 S.Ct. 1179 (1964), indicates no position by the High Court on the lower court dispositions of that case.

Other Supreme Court cases, however, do indicate that damages awarded for unseaworthiness are mitigated to the extent that the seaman's injury was also proximately caused by his own negligence. In *Sieracki*, Justice Rutledge stated that "[c]ontributory negligence * * * in suits brought by seamen to recover for injuries due to a ship's unseaworthiness * * * has been applied merely in mitigation of damages." Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94 n. 11, 66 S.Ct. 872, 877, 90 L.Ed. 1099 (1946). And in Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202 (1953), Justice Black wrote for the Court:

"The harsh rule of the common law under which contributory negligence wholly barred an injured person from recovery is completely incompatible with modern admiralty policy and practice. Exercising its traditional discretion, admiralty has developed and now follows its own fairer and more flexible rule which allows such consideration of contributory negligence in mitigation of damages as justice requires." 346 U.S. at 408–409, 74 S.Ct. at 205.

The same point is covered in the concurring opinion of Justice Frankfurter:

"The right of seamen to recover for unseaworthiness is peculiarly a cause of 'admiralty and maritime jurisdiction,' 1 Stat. 73, 77. The right is in the nature of liability without fault for which contributory negligence is not a bar to recovery, although it may be relevant in assessing the damages." 346 U.S. at 415, 74 S.Ct. at 208.

There was no error in the trial court's reduction of damages on account of the contributory negligence of Zannino and Clark.[6]

This leaves only the question of the amount of damages and their apportionment according to the formula chosen, and we review these findings under the "clearly erroneous" test. See McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Guzman v. Pichirilo, 369 U.S. 698, 702, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962). A review of the evidence indicates that the amount and the apportionment were not clearly erroneous and should not be set aside.

The judgment is accordingly affirmed.

6. This Court has previously upheld a district court finding that
"'\* \* \* The doctrine of comparative negligence is in full effect under both the Jones Act and general maritime law or admiralty and the [libelant] is barred from recovery under either by reason of his own negligence, it being one hundred percent.'" Keel v. Greenville Mid-Stream Service, Inc., 321 F.2d 903, 904 (5th Cir. 1963) (per curiam).