**Doris E. NYE, Individually and as Administratrix Ad Prosequendum of the Estate of Charles W. Nye, Deceased, et al., Plaintiffs,**

v.

**A/S D/S SVENDBORG and D/S OF 1912 A/S, Defendants.**

**A/S D/S SVENDBORG and D/S OF 1912 A/S, Defendants and Third-Party Plaintiffs,**

v.

**MARINE ENGINE SPECIALTIES CORP., Third-Party Defendant.**

**No. 69 Civ. 141.**

United States District Court, S. D. New York.

May 18, 1973.

Gair, Gair & Conason, New York City, for plaintiffs.

Haight, Gardner, Poor & Havens, New York City, for defendants and third-party plaintiffs by William P. Kain, Jr., Thomas F. Molanphy, New York City, of counsel.

Coppola & D'Onofrio, New York City, for third-party defendant; Larkin, Wrenn & Cumisky, New York City, of counsel.

GURFEIN, District Judge.

This action was begun in the Supreme Court of New York County against the defendant shipowner and its agent alleging that the death of plaintiffs' decedent on the high seas was caused by the unseaworthiness of the vessel "EVELYN MAERSK" and by the negligence of her crew. The action was removed to this Court upon the ground of diversity of citizenship. The defendants have earlier been found to have waived their right to trial by jury. The defendants, as third party plaintiffs, have brought an action

for indemnification against Marine Engine Specialties Corp., the employer of the decedent for alleged breach of the warranty of workmanlike service. The case was tried without a jury.

The subject matter jurisdiction rests on 28 U.S.C. § 1332—diversity of citizenship. Even if the action had remained in the State Court, it would lie under general maritime law for death caused by violation of maritime duties. Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).[1] Since there is diversity of citizenship, the limitation of federal question jurisdiction under Romero v. International Terminal Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1958) does not apply. Nor is the right to jury trial a matter for consideration, since that right has been waived.

Charles W. Nye was a United States citizen who was a repairer of ship pumps. He was flown from New York to the Canary Islands to repair a pump on the defendants' vessel, EVELYN MAERSK ("Evelyn"), a Danish flag ship. The Evelyn was equipped with feed pumps manufactured by Pacific Pumps of Los Angeles, supplied to the vessel by Kockums Mekaniska Verkstad of Malmo, Sweden ("Kockums"). On her maiden voyage, which made no call at United States ports, a feed pump failed and she put into the Canary Islands. Kockums was called by the vessel's owner and it ordered a new pump to be installed under the supervision of Pacific Pumps. In turn, Pacific, pursuant to a service agreement, asked Marine Engine Specialties Corp. ("Marine"), a United States entity and the employer of plaintiffs' decedent Nye, to fly him there to supervise the installation. While ascending a pilot ladder drawn over the side of the vessel, Nye fell to his death on December 30, 1967 in the evening.

At 5:30 a. m. on the morning of December 30, 1967 the Evelyn had dropped anchor about a half mile East of the main channel of the port of Las Palmas (Jensen Dep. 32).[2] A half hour later a replacement pump was delivered and hoisted on board. The defective pump was removed to the deck and the new pump was put in its place by the ship's engineers (Jensen Dep. 23). The installation was completed by the ship's own engineers after the accident (Jensen Dep. 94).

During the day the weather was uneven with periods of rain. After 4 p. m., however, all shower activity had ceased (Jensen Dep. 27). Some time during the day the ship had been informed by the ship's agent in Las Palmas that Nye, the deceased, would be arriving by pilot launch (Jensen Dep. 33–34). Between 4 and 5 p. m. preparations, in the form of the rigging of the ladders to be used in effecting Nye's boarding, were carried out (Jensen Dep. 68–69; Testimony of Chief Officer R. Moller, hereinafter "Moller"). The boarding apparatus so rigged consisted of an accommodation ladder and a pilot ladder. The accommodation ladder, rigged first (Jensen Dep. 68), was made of aluminum with fixed rails. It was a rigid ladder and was hinged to the platform at the height of the deck (Jensen Dep. 39–40). The platform, about ¾ of a meter or 30 inches square, extended from the side of the ship through an opening in the deck rail (Jensen Dep. 48–49). The accommodation ladder did not hang down perpendicularly from the platform but extended at an angle away from the side of the ship (Jensen Dep. 64; Pl. Ex. 5; Deft. Ex. Q).

The pilot ladder was made of wooden steps fixed to 2½ inch tarred hemp lines by means of wooden side blocks. The ladder was 16 meters long with forty-seven steps. Each step was .114 meters or approximately 4½ inches wide and .025 meters or approximately one foot apart. The pilot ladder was brand new and when rigged was being used for the first time

1. *Moragne, supra,* was removed to the Federal Court on the ground of diversity of citizenship.

2. Jensen was the marine superintendent of the A. P. Moller Steamship Company aboard for the maiden voyage.

(Jensen Dep. 95). Shortly before the pilot ladder was rigged it was inspected by Jensen. On the basis of his inspection, which took approximately fifteen minutes, Jensen determined that the ladder was in perfect condition (Jensen Dep. 102–04). Prior to its rigging, the pilot ladder had been stored in an interior area of the vessel (bosun's storeroom) and was consequently not exposed to the elements during the preceding shower activity (Jensen Dep. 51). Chief Officer Moller made another inspection at the time he supervised the actual rigging. The pilot ladder was not attached to the accommodation ladder but was rather affixed to the two upper courses of the starboard deck rail. The lines of rope which form the sides of the ladder were flung over the uppermost rung of the rail, beneath the next one, up again and then made fast with knots (Jensen Dep. 91–92; Pl. Ex. 5). As the photograph in evidence (Pl. Ex. 5) indicates, the rigid accommodation ladder did not extend all the way to the water line. The difference was made up by the pilot ladder which reached down to within two feet of the water (Jensen Dep. 64; Moller).

The manner of boarding by this arrangement was to climb the pilot ladder, which hung parallel to the side of the vessel, until one reached the accommodation ladder. Then the person boarding could simply walk up the accommodation ladder to the deck. The reason advanced for employing this method of boarding was that it is dangerous for a launch to approach a rigid ladder (Jensen Dep. 56).

At the port of Las Palmas Mr. Nye boarded a pilot launch belonging to a third person not a party to this action. From the pilot launch Nye contacted the Evelyn by radio-telephone to inform them that he was on his way (Jensen Dep. 33). At 7:25 p. m. upon observing the approach of the launch Jensen ordered the anchor raised in order to make a lee. Jensen testified that this was normal practice when taking a person aboard. The purpose of executing the lee is to shield the side of the ship where boarding is to take place from the effects of wind and water motion (Jensen Dep. 30–31, 96). Though Jensen testified that his maneuver was completed just before the launch reached the ship, she did not drop anchor again (Jensen Dep. 36). Captain Ash, the plaintiffs' expert, believed that she was under way at boarding and I so find.

The accommodation ladder and pilot ladder were illuminated by a gangway light of 400 watts, two floodlights of 200 watts each, and what were called cluster lights, totalling 375 watts, which were fixed to the ship's rail above the pilot ladder and which directed their light downward to the sea (Jensen Dep. 54–55, 63; Moller). According to Jensen's testimony the entire boarding area was well illuminated (Jensen Dep. 55). After two unsuccessful attempts to maneuver the pilot launch [3] close enough to the Evelyn to permit Nye to begin his ascent of the pilot ladder, the pilot boat was finally able to effect the transfer. At the time of the transfer the midship part of the launch was "very close" (Jensen Dep. 73–74). The launch was not moored to the Evelyn at the time of the transfer nor was there any attempt to do so (Jensen Dep. 76; Moller). Jensen testified that the waves were about three feet high (Jensen Dep. 76). The freeboard of the launch was three to four feet. The pilot ladder was not equipped with any hand holds (Jensen Dep. 76–77).

The actual transferral was effected without incident. Immediately after the transferral the launch pulled away (Jensen Dep. 97–98). Nye proceeded up the pilot ladder. Gripping the rope sides of the ladder, Nye climbed between one and three steps upward (Jensen Dep. 77; Moller). No one aided him or said anything to him as he mounted the ladder (Jensen Dep. 78, 90–91). Suddenly Nye

3. According to Jensen's testimony, the pilot launch measured around 25 to 30 feet in length and was 6 to 7 feet wide (Jensen Dep. 34, 90).

stopped and shouted "help me, help me" (Moller; see Jensen Dep. 79), and shortly thereafter he fell into the water.

There was no one on the platform of the accommodation ladder, and there was no crew member with a gaff or other type of pole to assist the person boarding (Jensen Dep. 83–84). Moller descended only halfway down the accommodation ladder. When he saw that a line with a life ring had been thrown to Nye, Moller went back up, as he says, to direct operations instead of going down to help Nye. He went up to the poop deck, put the spotlight on and waved to the pilot boat to come closer.

Nor did Jensen wait to see Nye safely aboard. Instead, he went to the wheelhouse after Nye had put his foot on a rung of the pilot ladder (Jensen Dep. 79). When he heard a cry Jensen ran back to the rail and by that time saw Nye holding on to a life ring (Jensen Dep. 80). One of the sailors, Hansen, was holding onto the rope to which the life ring was attached. Hansen did not pull the rope or otherwise attempt to haul it in (Jensen Dep. 81–82). Jensen went back to the wheelhouse and telephoned the engine room to stop the propeller absolutely. After Nye fell into the water, the pilot launch attempted to effect a rescue (Jensen Dep. 89; Moller). Moller testified that it took him approximately four to five minutes from the time he quit the accommodation ladder until he had turned the additional spotlight (the starboard life boat light) on. When he had turned the light on, he no longer saw Nye holding onto the life ring. No marker lights were thrown out for fear of hitting Nye. No general alarm was sounded. No boat was lowered from the Evelyn though there was a search for half an hour (Moller). The crew of the Evelyn apparently played no part in the recovery of Nye's body sometime after the aforedescribed events (Jensen Dep. 101).

At the time of his death, Nye's physical appearance could be characterized as obese (Def. Ex.S, autopsy report). At the trial, data from physical examinations of Nye taken during the period August 22–November 7, 1966 were offered into evidence and analyzed by a medical expert. On August 22, 1966 Nye measured 6 feet in height and tipped the scales at 350 pounds. He suffered from swelling of the ankles (edema) and his blood pressure was 180/118. The diagnosis made at that time indicated that Nye was suffering from diabetes, obesity, hypertension and Pickwickian syndrome (Def. Ex.R; Testimony of Dr. Marcus Bloomfield, hereinafter "Bloomfield"). The latter syndrome is a complex of exogenous obesity (self-induced), somnolence, erythrocytosis and hyperventilation or a condition in which there is a reduced amount of air entering the pulmonary alveoli, resulting in elevation of the carbon dioxide tension (Dorland, Illustrated Medical Dictionary 717 (24th ed. 1965)). This diagnosis was reconfirmed on September 6, 1966. The possible presence of a kidney disease seen in diabetics causing renal failure, was tentatively diagnosed (Bloomfield). Cardiomegaly, a morbid condition characterized by enlargement of the heart, with localized deposits of glycogen in the heart muscle was also detected. This latter diagnosis was supported by an X-ray and an electrocardiogram (Def.Ex.T; Bloomfield). Nye was described by one attending physician as a grossly obese white male diabetic (Def.Ex.T at p. J).

By November 7, 1966 Nye's weight had been brought down to 310 pounds. His blood pressure was down to 160/100. The edema had disappeared and his heart was characterized as "O.K." His obese condition was still described as serious despite the considerable weight loss of forty pounds (Bloomfield).

His obesity was apparently chronic, having its source in early childhood (Def. Ex.T at pp. F, I). There is no evidence to indicate that at the time of his death this chronically obese condition had been significantly reduced or that his Pickwickian syndrome had significantly abated. The Spanish autopsy report (in translation) is unspecific. It merely notes that the corpse was "of a fat con-

stitution, with a weight of one hundred to one hundred and sixty five kilos . . ." (Def.Ex.S) or approximately between 220 and 365 pounds.

When the pump was hoisted aboard earlier in the day the vessel alongside was tied to a boat rope. This was an item of equipment that could have been used to hold the pilot boat close to the vessel when the decedent ascended the rope ladder.[4] If the pilot boat had remained adjacent to the Evelyn with its stern near the ladder until Nye fell off the ladder, he would have fallen so close to the boat that he could have been lifted into it. Similarly if a man rope had been available Nye might have been able to steady himself on the ladder.

■■ The ship argues that these accessories would have made no difference because Nye was already two rungs up the ladder when he lost his grip. This assumes that the issue is whether he "made" the pilot ladder safely. The issue is rather whether proper precautions were taken and proper equipment made available to prevent his falling off or to protect him from fatal consequences if he did fall. In the face of actual disaster even common custom that gets by most of the time is not the test of unseaworthiness in particular circumstances. See Trahan v. Superior Oil Co., 204 F. Supp. 627, 631–632 (W.D.La.1962), aff'd, 322 F.2d 234 (5 Cir. 1963). The ship was expecting a person, of uncertain lay status, not a professional pilot, to board a rope ladder while the vessel was making a lee with waves as high as three to four feet. In these circumstances someone should have been on the platform of the accommodation ladder to be ready to lend a hand if necessary and a man rope and a boat rope should have been made available. The operating negligence of the crew rendered the vessel unseaworthy. Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944);

Mitchell v. Trawler Racer, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967).

■ I find that the vessel was unseaworthy for boarding in the circumstances and that the unseaworthiness was the proximate cause of the death. That conclusion is based on the assumption that United States law governs, for I have not heard evidence on the foreign law respecting the unseaworthiness doctrine.[5]

■ But I also find that the shipowner was negligent in not supplying the safeguards mentioned in the circumstances. Under maritime law the owner of a ship owes a duty of reasonable care to all who are on board and boarding for purposes not inimical to the shipowner's legitimate interests. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 632, 79 S.Ct. 406, 3 L.Ed. 2d 550 (1959). See Rivera v. Farrell Lines, Inc., 474 F.2d 255 (2 Cir. 1973); Grillo v. Royal Norwegian Government, 139 F.2d 237 (2 Cir. 1943). Thus, whether Nye qualified as a member of a ship's crew or not under the doctrine of Seas Shipping Co. v. Sieracki, 328 U.S. 85, 95, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), a duty of care was owed him to provide a reasonably safe method of boarding as part of the international maritime law of the sea. Superior Oil Company v. Trahan, *supra*, 322 F.2d at 235 (5 Cir. 1963).

■ I do find, however, that United States law in particular governs and that Nye who came aboard to install the new pump was entitled to a seaworthy ship.

Seven factors were listed in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) to determine the governing law: (1) place of the wrongful act; (2) law of the flag; (3) allegiance or domicile of the injured; (4) allegiance of the defendant shipowner;

4. I do not credit the testimony of the defendants' experts to the contrary.

5. The Court determined earlier as a preliminary matter that the question of what law governs related only to the issue of unseaworthiness, and reserved further determination of the choice of law until the evidence was in. D.C., 358 F.Supp. 142.

(5) place of contract; (6) inaccessibility of foreign forum; and (7) law of the forum.

The Supreme Court also said: "Each nation has a legitimate interest that its nationals and permanent inhabitants be not maimed or disabled from self-support." 345 U.S. at 586, 73 S.Ct. at 930.

In the case at bar an American company was asked to supply a man to install the pump. He came to the ship directly from the United States. As the Court of Appeals for the Fifth Circuit said in Symonette Shipyards, Ltd. v. Clark, 365 F.2d 464, 467 (1966), cert. denied, 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625: "In the context of this case, we believe the most significant choice of law factor to be the nationality of the injured and deceased seamen."

The citizenship of Nye and the factors surrounding his coming from the United States to board the ship in Spanish waters are sufficient to justify applying the law of the United States.[6] See *Symonette, supra,* 365 F.2d at 467; see Gilmore & Black, Admiralty, § 6–64 at 388 (1957).

 Nor did Nye, in my judgment, fail to qualify as a beneficiary of the *Sieracki* unseaworthiness doctrine. See Pope & Talbot Inc. v. Hawn, 346 U.S. 406, 412–413, 74 S.Ct. 202, 98 L.Ed. 143 (1953). The ship was in navigation. Repair of the pump would clearly entitle the repairman to the status of a crew member. Such a person is "within the class protected by the warranty of seaworthiness as developed by federal maritime law . . ." The Tungus v. Skovgaard, 358 U.S. 588, 595, n. 9, 79 S.Ct. 503, 508, 3 L.Ed.2d 524; see also Lawlor v. Socony-Vacuum Oil Co., 275 F. 2d 599 (2 Cir. 1960). It is but a step from repair to installation of the pump which was actually accomplished by the ship's engineers. The vessel was in navigation, subject to the perils of the seas, rather than in drydock.

 Whether the finding is that the vessel was unseaworthy or that her crew were negligent, the doctrine of contributory negligence as a ground for mitigation of damages is available. Pope & Talbot, Inc. v. Hawn, *supra;* Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265 (1939). And a failure to ask for better conditions in boarding and descending can be contributory negligence. Davis v. Associated Pipe Line Contractors, Inc., 305 F.Supp. 1345, 1349–1350 (W.D.La.1968), aff'd, 418 F.2d 920 (5 Cir. 1969), cert. denied, 397 U.S. 988, 90 S.Ct. 1119, 25 L.Ed.2d 396 (1970); Superior Oil Company v. Trahan, *supra,* 322 F.2d at 237.

 I find that Nye, an obese individual, who, upon the evidence had had an earlier incident of boarding with difficulty and who had availed himself of a tie line for boarding on another occasion, should have requested additional aid in boarding. I find he was 50% at fault.

 This, in turn, requires the employer of Nye to indemnify the shipowner for 100% of the damage, even if the employer was not itself personally negligent. Italia Soc. v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1969). The warranty of workmanlike performance extends not only to materiel but also to human resources. "Putting the Italia criteria in human terms, while Golten [the employer] did not warrant a perfect rigger, it did warrant one who would not in fact be negligent." McLaughlin v. Trelleborgs Angfartygs A/B, 408 F.2d 1334, 1337 (2 Cir.), cert. denied, sub nom. Golten Marine Co. v. Trelleborgs Angfartygs A/B, 395 U.S. 946, 89 S.Ct. 2020, 23 L.Ed.2d 464 (1969).[7]

 The harshness of the *Italia* rule is mitigated in this case because I

---

6. I do not mean to imply that just because a plaintiff is an American national United States law must apply. *Cf.* Tjonaman v. A/S Glittre, 340 F.2d 290 (2 Cir. 1965), cert. denied, 381 U.S. 925, 85 S.Ct. 1561, 14 L.Ed.2d 684 (1965).

7. The employer of the rigger was not a stevedore.

find that the employer of Nye was, in fact, negligent in ordering a man in Nye's physical condition to hazard a journey which could involve climbing onto a vessel at sea. *Cf.* Hartnett v. Reiss Steamship Company, 421 F.2d 1011, 1018 (2 Cir. 1970).[8]

Accordingly, the plaintiffs will receive one-half of the damages found from Marine Engine Specialties Corp.

### THE FAILURE TO RESCUE

In view of the above determination that unseaworthiness was the proximate cause of death, it is not essential to decide whether there was also negligence in failing to rescue the decedent. But, since there may be an appeal, I find that the crew was reasonably diligent in the circumstances. The pilot boat was already in the water, and launching a lifeboat on the starboard side would not only have taken some time, but also might have proved dangerous, for it might have hit the man in the water. Lights were turned on and observation was made from the deck, a more effective vantage point than the surface of the water. The engines were stopped and a seaman stood by with a life-line. The plaintiffs argue that a life raft should have been dropped and the thought occurs that a seaman might have been sent to the bottom of the ship's ladder or into the sea. Under the emergency conditions, however, reasonably proper action appears to have been taken, although if a crew member had already been near the bottom of the ladder before the fall, he might have prevented the drowning. Since there is no finding of negligence in the rescue operation as such, it becomes irrelevant to note that there is no defense of contributory negligence to the duty of rescue. Kirincich v. Standard Dredging Co., 112 F.2d 163 (3 Cir. 1940).

8. Its negligence would not have allowed contribution by it as a joint tort feasor, for there is no right of contribution in a non-collision maritime case. Halcyon Lines v. Haenn Ship Corp., 342 U.S. 282,

### DAMAGES

Having determined that under United States law the ship was unseaworthy, we must also apply that law to determine the damages due to survivors of a decedent under that law.

The plaintiffs have a proper claim for relief in a diversity of citizenship case for damages for wrongful death on the high seas caused by unseaworthiness. Moragne v. States Marine Lines, *supra*.

Since this action is not on the admiralty side of the Court 'it cannot be considered as brought under the Death on the High Seas Act, 46 U.S.C. § 761 et seq., but that Act may afford analogy in determining the schedule of beneficiaries. See *Moragne, supra*, 398 U.S. at 407, 408, 90 S.Ct. 1772. And I believe we may also resort to cases under it for the elements of damage in an action for death on the high seas, since there is no logical reason for determining damages differently where the action is on the law side rather than in admiralty.

The awards are to be computed on a two-stage basis, and in the words of Judge Weinfeld, (1) the damages to the date of decision are to be totalled without discount and increased by prejudgment interest, and (2) future damages are to be discounted to their present value. Petition of Marina Mercante Nicaraguense, S. A., 248 F.Supp. 15, 25–26 (S.D.N.Y.1965), aff'd, 364 F.2d 118 (2 Cir. 1966).

The elements of damage are:

(1) the decedent's earning capacity, what he might reasonably have been expected to earn had he lived, and the extent to which the surviving defendants "might logically and reasonably have been expected to share in it." O'Connor v. United States, 269 F.2d 578, 582 (2 Cir. 1959).

72 S.Ct. 277, 96 L.Ed. 318 (1952). That is still the law. Atlantic etc., Coast Line Railroad Co. v. Erie Lackawanna Railroad Co., 406 U.S. 340, 92 S.Ct. 1550, 32 L.Ed.2d 110 (1972).

(2) Loss of a father's care, guidance and training. Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583, 588, 593 n. 9a (2 Cir. 1961), but this must be reducible to pecuniary value. First National Bank in Greenwich v. National Airlines, Inc., 171 F.Supp. 528 (S.D.N.Y. 1958), aff'd, 288 F.2d 621 (2 Cir. 1961).

(3) Funeral expenses. Dennis v. Central Gulf S/S Corp., 453 F.2d 137 (5 Cir. 1972).

(4) Pain and suffering. See *Richardson, supra*.

On the other hand, loss of consortium is not compensable. Igneri v. Cie. de Transports Oceaniques, 323 F.2d 257 (2 Cir. 1963).

Applying these principles, I find:

1. The decedent was 46 years old and left him surviving a widow and five children whose ages were 10, 12, 13, 15 and 21.

2. The decedent earned $15,462.67 in the year 1967.

3. The defendants have conceded that if Nye were alive today he would be earning $20,000 a year.

4. A normal, healthy male of 46 had a life expectancy of 26.5 years to age 72.5.

5. There was no evidence of working life expectancy. I will assume age 60 in view of the peripatetic nature of the employment

6. The decedent was an obese individual, with diabetes and high blood pressure (hypertension) and cardiomegaly, with a possible kidney disease complication. His chances for longevity were considerably below average. His morbid condition shortened his life expectancy by at least ten years, and I would judge that his work expectancy would not exceed age 55. These are not scientific findings, see Civil v. Waterman S. S. Corp., 217 F.2d 94, 99 (2 Cir. 1954), but I think they give the plaintiffs the benefit of some doubt.

7. I will accept the figure of $20,000 a year as the measure of the decedent's earnings without deducting for income taxes from this time forward, (see McWeeney v. New York, N. H. & H. RR Co., 282 F.2d 34, 35–39 (2 Cir. 1960), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93; Petition of Marina Mercante Nicaraguense, S. A., *supra*, 364 F.2d at 125–126), and take $15,500 for the years 1968–May 1973, four years and five months.

8. I will follow Judge Weinfeld's formulation in *Marina Mercante, supra*, 248 F.Supp. at 27 (since the facts are quite similar) that the amount of contribution of which the family was deprived, where there was a wife and four children, was 80% (one child was over 21), a wife and two or three children 75% (two of the children will reach majority over the next five years).[9]

### AWARD TO DATE

*A. Loss of Pecuniary Contribution.* From January 1, 1968 to May 1, 1973 the decedent would have earned at the rate of $15,500 a year, the sum of $1,292 per month for 53 months, or a gross of $68,476, of which 80% equals $54,780, or $12,400 a year.

*B. Loss of Nurture.* For each child $75 a month or $300 for the four children. For 53 months this equals $15,900.

*C. Pain and Suffering.* $2,000.

*D. Funeral Expenses.* $2,625.58.

Total: $75,305.58.

### POST-JUDGMENT AWARD

1. Assuming $20,000 a year compensation for the remaining five years of work expectancy to age 55, the following is a table reflecting the appropriate distribution to which each family member is entitled discounted to present value. Included in the distribution table are the

---

9. The wife and each child are considered an aliquot part of the family unit. This was approved in *Marina Mercante, supra*, 364 F.2d 118, *passim*.

amounts to which the children are entitled for loss of nurture.

### YEAR 1 (80% OF $20,000)

| Age of Children | Family Member | Compensation for lost earnings | Compensation for loss of nurture |
|---|---|---|---|
| | Wife | $3,200 | –0– |
| Over 21 | Child A | –0– | –0– |
| 19 | Child B | $3,200 | $900 |
| 17 | Child C | $3,200 | $900 |
| 16 | Child D | $3,200 | $900 |
| 14 | Child E | $3,200 | $900 |

### YEAR 2 (80% OF $20,000)

| | Wife | $3,200 | –0– |
|---|---|---|---|
| Over 21 | Child A | –0– | –0– |
| 20 | Child B | $3,200 | $900 |
| 18 | Child C | $3,200 | $900 |
| 17 | Child D | $3,200 | $900 |
| 15 | Child E | $3,200 | $900 |

### YEAR 3 (75% OF $20,000)

| | Wife | $3,750 | –0– |
|---|---|---|---|
| Over 21 | Child A | –0– | –0– |
| 21 | Child B | –0– | –0– |
| 19 | Child C | $3,750 | $900 |
| 18 | Child D | $3,750 | $900 |
| 16 | Child E | $3,750 | $900 |

### YEAR 4 (75% OF $20,000)

| | Wife | $3,750 | –0– |
|---|---|---|---|
| Over 21 | Child A | –0– | –0– |
| Over 21 | Child B | –0– | –0– |
| 20 | Child C | $3,750 | $900 |
| 19 | Child D | $3,750 | $900 |
| 17 | Child E | $3,750 | $900 |

### YEAR 5 (75% OF $20,000)

| | Wife | $5,000 | –0– |
|---|---|---|---|
| Over 21 | Child A | –0– | –0– |
| Over 21 | Child B | –0– | –0– |
| 21 | Child C | –0– | –0– |
| 20 | Child D | $5,000 | $900 |
| 18 | Child E | $5,000 | $900 |

### TOTALS

| Family Member | Gross Amount of Compensation for lost earnings plus loss of nurture | Average Gross Amount per Year | Discount Rate of 5% Using a Factor of 4.329 | Net Distribution right per family member |
|---|---|---|---|---|
| Wife | $18,900 | $3,780 | x 4.329 = | $16,363.62 |
| Child A | –0– | –0– | x 4.329 = | –0– |
| Child B | $ 8,200 | $1,640 | x 4.329 = | $ 7,099.56 |
| Child C | $17,500 | $3,500 | x 4.329 = | $15,151.50 |
| Child D | $23,400 | $4,680 | x 4.329 = | $20,259.72 |
| Child E | $23,400 | $4,680 | x 4.329 = | $20,259.72 |
| TOTALS | $91,400 | | | $79,134.12 |

The total of the award to date and the post-judgment award = $75,305.58 plus $79,134 = $154,439.58, divided by 2

(50% contributory negligence) =$77,220. Under the teaching of Moore-McCormack Lines, Inc. v. Richardson, *supra*, 295 F.2d at 592–595, pre-judgment interest at 5% per annum is awarded on the sum of $37,653 (50% of the pre-judgment award). The defendants shall have costs and counsel fees against the third-party defendant.

The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

Submit decree in accordance with the foregoing.