**In re The CHARTER COMPANY, et al., Debtors.**

**CHARTER CRUDE OIL COMPANY, Plaintiff,**

**v.**

**PETROLEOS MEXICANOS, Defendant.**

**Bankruptcy Nos. 84–289–BK–J–GP to 84–332–BK–J–GP and 85–1033–BK–J–GP. Adv. No. 86–160.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Nov. 23, 1988.

James H. Post, Jacksonville, Fla., for CCOC.

Earl M. Barker, Jr., Jacksonville, Fla., and Alfredo R. Perez, Houston, Tex., for Pemex.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This adversary proceeding is before the Court upon the Complaint filed by Charter

Crude Oil Company ("CCOC") against Petroleos Mexicanos ("Pemex") seeking the turnover of a $34,352.96 demurrage debt and upon the objection to the $1,639,432.96 proof of claim filed by Pemex against CCOC and Charter International Sales Corporation. By order entered October 16, 1987, these matters were consolidated for trial which was held July 27, 1988. Upon the evidence presented, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. On January 1, 1980, Pemex and Charter International Oil Company ("CIOC") entered into an Agreement for the Sale of Crude Oil. CIOC assigned its rights under the Pemex contract to CCOC (the "Pemex/CCOC Contract") in January of 1981.

2. The Pemex/CCOC Contract contains the following provisions material to this adversary proceeding:

ARTICLE 3: Quality/Quantity of Crude Oil

i) The quantity of crude oil delivered hereunder shall average 13,000 barrels per day, plus/minus five percent at BUYER's/SELLER's option by mutual agreement to be lifted relatively evenly in full cargoes in accordance with the provisions of Article 7, hereof....

ARTICLE 4: Price

i) BUYER shall pay PEMEX for each quantity of crude oil which has been certified as loaded FOB tank vessel after deduction of all BS & W as shown in the certificate of quality on actual base selling price(s) established in accordance with the procedures set out in paragraph v) of this Article.

\* \* \* \* \* \*

v) The price for the crude oil(s) in the Agreement may be adjusted for each calendar quarter subject to mutual agreement and renegotiation.

\* \* \* \* \* \*

If the agreement is suspended for two consecutive quarters, and no price agreement is reached for the third quarter, this agreement shall be automatically terminated on the last day of the second suspended quarter.

vi) In regard to price application, if loading commence last day of any specific quarter prior to a price variation, the price to be applied for that specific cargo is the price in force when cargo has been commenced and such price will be applied for the full cargo in spite of that finishing of loading falls in the next price period.

In addition, Article 8 of that agreement provides that a laytime of 36 hours would be allowed before demurrage liability would begin to accrue.

3. The Pemex/CCOC Contract was similar to crude oil sales contracts which Pemex had in 1981 with approximately 20 other United States oil companies. Pursuant to these contracts, Pemex adjusted its posted prices on a quarterly basis depending upon world oil market conditions.

4. Through a series of telex exchanges beginning April 6, 1981, Pemex and CCOC agreed that the price of crude oil for the second quarter of 1981 would be $38.50 per barrel for Isthmus crude oil and $32.00 per barrel for the Maya crude oil. The telex from Pemex read as follows:

Re crude oil export prices for second quarter 1981 following our conversations concerning crude oil prices for second quarter 1981, with this telex Pemex gives notice that:

1—For Istmo 34 G. API, price will be 38.50 dollars per barrel.

2—For Maya 23 G. API, price will be 32.00 dollars per barrel.

3—Both prices will be FOB loading point with payment terms 30 days after bill of lading date.

4—These prices are to be effective as of April 1, 1981.

5—If market conditions change these prices could be revised within the quarter.

The CCOC telex in response read as follows:

Ref: Prices for Maya and Isthmus crude oil for second quarter 1981.

We accept the pricing format as set out in your telex dated April 4, 1981.

5. The prices established by Pemex pursuant to this April 6, 1981, agreement were paid by CCOC with respect to two liftings of crude oil commenced April 1, 1981, and April 29, 1981.

6. On May 12, 1981, CCOC notified Pemex by telex that CCOC intended to lift a third order of crude oil from Pemex during this quarter. On May 13, 1981, Pemex notified CCOC by return telex that its proposed nomination was accepted and on May 22, 1981, Pemex informed CCOC that the loading could commence on or after May 28, 1981.

7. On May 29, 1981, the vessel chartered by CCOC, the Amoco Savannah, arrived outside the docking facilities of Pemex at Coatzacoalcos, Mexico. The Amoco Savannah tendered its "Notice of Readiness" upon Pemex at 8:22 a.m. that same day.

8. At 9:00 p.m. on the evening of May 31, 1981, the loading of Maya crude oil commenced. At 10:10 p.m. that same evening the loading stopped "due [to a] shore request" and did not resume until after midnight June 1, 1981. The loading was finally completed June 2, 1981.

9. On June 2, 1981, the loading of Isthmus crude oil commenced at 10:15 a.m. By 2:00 a.m. the next day, the loading was completed.

10. The total volume of crude oil delivered between May 29, 1981, and June 3, 1981, was 34,018 metric tons of Maya crude oil and 22,423 metric tons of Isthmus crude oil. Using the prices in effect for the second quarter of 1981, Pemex calculated the amount due under the contract to be $13,-780,237.00 and thereafter billed CCOC for this amount. Payment was due July 3, 1981, thirty (30) days from loading.

11. On June 3, 1981, Pemex issued a telex to CCOC stating that Pemex "has decided to adjust" its crude oil prices for the third quarter of 1981 "effective June 1, 1981" to reflect a price reduction in the amount of $4.00 per barrel for both Maya crude oil and Isthmus crude oil. The telex also requested confirmation of acceptance from CCOC. The decision by Pemex to reduce its crude oil prices was described by Pemex as "a major decision" which "reflected the oversupply situation and the [high prices] which purchasers of Mexican crude had been complaining [of]."

12. CCOC considered the new prices to be unacceptable and by telexes dated June 12 and June 24, 1981, it informed Pemex that it was suspending its liftings under the Pemex/CCOC Contract for the third quarter of 1981. CCOC then requested that the prices for the liftings in the fourth quarter of 1981 be renegotiated in accordance with Article 4(v) of the Pemex/CCOC Contract. The telex dated June 12, 1981, read as follows:

Appreciate greatly your U.S. dollars 4.00 reduction in crude posting and do understand your new pricing concept. Unfortunately, this price still does not enable Charter to run profitably at either Freeport or Houston refineries.

Your new program of immediate price changes may work to our betterment or detriment and is unknown at this time. Therefore, we must reluctantly inform you that your new prices are unacceptable. However, we would welcome and may consider favorably a further reduction of prices on third quarter allocations.

We appreciate your understanding of our position.

CCOC's telex of June 24, 1981 stated: Regarding your recent telex requesting that Charter International Oil Company (+CIOC+) submit nominations for July, 1981, purchases, please be advised that pursuant to Article 4, Paragraph (v) of the referenced Agreement, by telex dated May 29, 1981, CIOC requested a renegotiation of prices for the calendar quarter beginning July 1, 1981, and offers to meet with your representatives to begin these negotiations during the week of June 1—5, 1981. No agreement was reached by June 16, 1981, as required by Article 4, Paragraph (v) of the Agreement, with respect to prices for the quarter beginning July 1, 1981. Accordingly,

pursuant to Article 4, Paragraph (v) of the Agreement, liftings are suspended for such quarter and, therefore, nominations are unnecessary.

We would like to meet with you at your convenience to discuss the resumption of liftings at a mutually acceptable price for the quarter beginning October 1, 1981, or at the earliest mutually agreeable date prior to October 1, 1981.

13. On June 23, 1981, CCOC responded to the invoice sent by Pemex and suggested that the proper amount of the Pemex invoice for the May 29, 1981, through June 3, 1981, lifting should have been $12,190,-933.00 to reflect the prices which went into effect June 1, 1981. On July 3, 1981, CCOC tendered $12,190,933.00 to Pemex.

14. On November 13, 1981, Pemex sent a telex to CCOC demanding payment of the $1,589,304 balance still due under the invoice.

15. On December 2, 1981, CCOC again notified Pemex by telex that the Pemex invoice was overstated by $1,589,304 and requested a credit memo in that amount from Pemex. Pemex responded to that telex and again demanded payment of $1,589,304.

16. In a separate dispute, CCOC issued an invoice dated January 6, 1981, to Pemex in the amount of $34,352.96 for the 2.94078 days of demurrage incurred by CCOC in connection with the loading of the Amoco Savannah. Soon afterwards, Pemex and CCOC began negotiating the settlement of all demurrage claims between the parties. In January, 1982, an agreement was reached and all disputed accounts were settled.

17. On April 18, 1986, CCOC filed a complaint with this Court seeking the turnover of the demurrage debt from Pemex. Pemex contends that the January, 1982, settlement encompassed this debt.

18. On June 30, 1986, Pemex rediscovered its $1,589,304 claim against CCOC and filed a motion with this Court for authorization to file an untimely proof of claim. On December 29, 1986, the Court entered an order granting Pemex's motion for enlargement of time to file a proof of claim and on January 28, 1987, Pemex filed its claim in the amount of $1,639,432.96.[1] The $1,639,432.96 includes the $1,589,304 debt owing under the Pemex/CCOC Contract as well as a $50,120.96 claim against Charter International Sales Corporation.

19. By order of this Court entered October 16, 1987, this adversary proceeding was consolidated for trial with the Debtors' objections to the Pemex proof of claim. At trial, Pemex withdrew its $50,128.96 claim against Charter International Sales Corporation.

### CONCLUSIONS OF LAW

The Pemex/CCOC Contract states that "[t]his Agreement shall be governed by and interpreted in accordance with the laws of Mexico."[2] Hence, the parties were required to present sufficient proof to establish the principles of foreign law which they contend are applicable. Otherwise, it is to be presumed that the law of the foreign state is the same as that of the present forum. *Symonette Shipyards, Ltd. v. Clark*, 365 F.2d 464 (5th Cir.1966); *Seguros Tepeyac, S.A., Compania Mexicana v. Bostrom*, 347 F.2d 168 (5th Cir.1965).

In this case, the defendant offered the expert testimony of Mr. Adolfo Grana, a professor of Mexican law and an attorney licensed to practice law in that country. His testimony reveals the following principles of Mexican law:

(i) a written contract cannot be modified by a course of conduct between the parties;

1. In that Order, the Court specifically found that the method of publication used by CIOC was insufficient to provide notice of the Bar Date to a foreign corporation which may or may not have subscribed to the publications employed. That decision is published and may be found at 68 B.R. 396.

2. In accordance with Bankruptcy Rule 9017, notice was given of Pemex's intent to "raise issues of law of the United Mexican States" during the trial of this adversary proceeding.

(ii) a contract can only be modified by following exactly the same formalities by which the original contract was created (for example, if the original contract was in writing and executed by the parties, it cannot be amended unless such an amendment is also made in writing with the requisite "formalities"); and

(iii) an agreement or course of conduct between the two parties which, due to the absence of the same formalities, does not qualify as an amendment to the original contract, is a new and separate contract.

The Court is satisfied that Mr. Grana has given an accurate statement of Mexican law and, without testimony to the contrary, it will analyze this proceeding in accordance with that testimony.

The primary issue in this proceeding is whether there was a mid-quarter change in prices which would have effected the amount due and owing for the May 29, 1981, through June 3, 1981, lifting. CCOC contends that there was and that such change became effective upon simple notice. To support this contention, CCOC points to prior conduct and the Pemex telex dated April 6, 1981, which states:

"If market conditions change, these prices could be revised within the quarter."

CCOC suggests that by accepting Pemex's pricing format by return telex dated April 6, 1981, an agreement to make mid-quarter changes in price was made. CCOC then argues that such a change occurred automatically when Pemex announced a change in prices effective June 1, 1981.

CCOC has also pointed out an incident which occurred on or about June 25, 1980, to support its position. There, Pemex gave notice of a mid-quarter change in prices and, without waiting for a response, required CCOC to pay the increased fee even though a CCOC chartered vessel had commenced loading prior to the change.

Although that situation is fairly similar to the one presented here, the Court finds such evidence immaterial to the decision at hand, for under Mexican law, a contract cannot be modified by a course of conduct between the parties. Thus, the parties are bound by the terms of the original contract even though they may have chosen to informally modify the contract on other occasions. Because the original contract indicates that prices could only be adjusted on a quarterly basis, the parties are so bound.

Secondly, even if a mid-quarter change in prices could be made, the evidence indicates that no such agreement was reached in this case. More specifically, by telex dated June 12, 1981, CCOC unequivocally rejected Pemex's June 6, 1981, offer and suspended liftings for the remainder of the quarter. Therefore, the terms of this transaction are left to be governed by the agreement reached April 6, 1981, which set prices at $38.50 per barrel for Isthmus crude oil and $32.00 per barrel for Maya crude oil. Using these figures, the amount owing from CCOC to Pemex for crude oil delivered between May 29, 1981, and June 3, 1981, is $13,780,237.00.

Finally, and again assuming that mid-quarter changes in price were permitted under the contract, such changes could only be effectuated upon compliance with the same formalities by which the original contract was made. Such formalities included joint signatures, initials on each page, etc. In the instant proceeding, the only evidence offered by CCOC that a change in prices had been made is the exchange in telexes between the parties. This hardly equates to the formalities under which the original contract was created and is ineffective to modify the contract.

Having found that there was no change in prices for the second quarter of 1981, the Court need not address the issue of whether the price in force when loading commenced is to be applied for the full cargo when loading falls within the next pricing period.[3]

---

**3.** Had the Court addressed this issue, it would have been guided by Article 4, section vi, of the Pemex/CCOC Contract which states that if loading commences during the last day of any specific quarter prior to a price variation, the price to be applied for that specific cargo is the price in force when loading began, and secondly, that such price will be applied for the full cargo

As for the $34,362.96 demurrage claim asserted by CCOC against Pemex, the Court finds that the January, 1982, settlement between the parties was intended to encompass this transaction. CCOC's claim is barred by the doctrine of accord, and satisfaction and CCOC is not entitled to any recovery on its demurrage claim.

## CONCLUSION

The Court finds that Mexican law and the terms of the Pemex/CCOC Contract govern the instant transaction, that the Pemex/CCOC Contract cannot be modified by course of conduct, and that CCOC unequivocally rejected Pemex's mid-quarter change in prices. Accordingly, CCOC is liable to Pemex in the amount of $1,589,304. CCOC's claim for demurrage relating to the Amoco Savannah is barred by the doctrine of accord and satisfaction and CCOC is not entitled to any recovery on this claim.

The Court will enter separate orders overruling CCOC's objection to Pemex's proof of claim and awarding final judgment in favor of Pemex in accordance with these findings.

## FINAL JUDGMENT

Upon Findings of Fact and Conclusions of Law separately entered, it is

ORDERED as follows:

1. Judgment is entered in favor of the defendant, Petroleos Mexicanos, and against the plaintiff, Charter Crude Oil Company.

2. The Complaint Seeking Turnover of a $34,362.96 demurrage claim is DISMISSED.

irrespective of whether the finishing of loading falls within the next time period.